## CASE NO. 13-6121

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT COURT

DVORA WEINSTEIN; STEVEN WEINSTEIN, Individually and on behalf of all others similarly situated,
*Plaintiffs,*

v.

AUBREY K. McCLENDON; CHESAPEAKE ENERGY CORPORATION; DOMENIC J. DELL'OSSO; MARCUS ROWLAND; MICHAEL A. JOHNSON; JEFFREY L. MOBLEY; HENRY J. HOOD,
*Defendants-Appellees.*

(*For Continuation of Caption See Reverse Side Reverse of Cover*)

On Appeal From The United States District Court
For The Western District Of Oklahoma (Oklahoma City)
The Honorable Vicki Miles-Lagrange
D.C. No. 5:12-cv-00465-M

## BRIEF OF DEFENDANTS-APPELLEES

Spencer F. Smith
**McAfee & Taft**
211 North Robinson, Suite 1000
Two Leadership Square, 10th Floor
Oklahoma City, OK 73102
Telephone: (405) 552-2246
Facsimile:   (405) 235-0439
spencer.smith@mcafeetaft.com

Robert P. Varian
M. Todd Scott
Alexander K. Talarides
**Orrick, Herrington & Sutcliffe LLP**
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
Facsimile:   (415) 773-5759
rvarian@orrick.com
tscott@orrick.com
atalarides@orrick.com

*Attorneys for Defendants-Appellees*

**ORAL ARGUMENT REQUESTED**

ONTARIO TEACHERS' PENSION PLAN BOARD,
*Movant-Appellant*,


-and-


IBI AMBAN INVESTMENT MANAGEMENT, LTD; CLAL PENSION &
PROVIDENT FUND, LTD; ARKANSAS PUBLIC EMPLOYEES
RETIREMENT SYSTEM; STATE UNIVERSITIES RETIREMENT SYSTEM
OF ILLINOIS; STATE OF OREGON, by and through the Oregon State Treasurer
and the Oregon Public Employee Retirement Board on behalf of the Oregon Public
Employee Retirement Fund; SHI YAN,
*Movants*,

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Chesapeake Energy Corporation ("Chesapeake" or "Defendant") hereby discloses that it does not have any parent corporations, and no public corporation holds 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ....................................................i

PRIOR OR RELATED APPEALS........................................................ xii

STATEMENT OF THE ISSUES............................................................1

STATEMENT OF FACTS ................................................................3

    A.    The District Court's Ruling.................................................4

    B.    Disclosures Regarding The FWPP And VPPs .................................5

        1.    The Founders Well Participation Program ................................5

        2.    Volumetric Production Payments .............................................8

    C.    The Individual Defendants Dramatically Increased Their Chesapeake Stock Holdings During the Class Period ......................12

SUMMARY OF THE ARGUMENT ....................................................13

ARGUMENT ...............................................................................17

    A.    The Reform Act's Heightened Standards For Pleading Securities Fraud ................................................................17

    B.    The Complaint's "Puzzle Pleading" Approach Violates Explicit Provisions Of The Reform Act............................................20

    C.    The Complaint Does Not Allege a Material Misstatement Or Actionable Omission In Any Event ..................................................22

        1.    The Complaint's FWPP Disclosure Allegations Are Untethered to the Facts or the Law ..........................................23

            a.    The Statements Regarding The FWPP's "Alignment of Interests" Constitute Non-Actionable Subjective Statements, And Were Accurate In Any Event ............ 23

            b.    Chesapeake Disclosed That McClendon Mortgaged His Personal FWPP Assets .......................................... 27

            c.    Related Party Disclosure Requirements Only Govern Transactions Where the Registrant is a Participant...... 28

         d.    Chesapeake was Under No Duty To Dislose Details Regarding McClendon's Personal Loans With Third Parties .......................................................................... 31

    2.    The Complaint's Attempt To Allege A Material Misstatement Regarding The VPPs Is Refuted By The Documents It Cites ................................................................32

  D.    The Complaint Failed To Plead Scienter ...........................................37

    1.    The Complaint Is Devoid Of Any Particularized Facts Supporting A "Strong Inference" of Scienter, As Required By The Reform Act ................................................38

    2.    The Existence Of Unqualified Audit Opinions And Absence Of A Restatement Further Refute Any Inference Of Scienter ............................................................40

    3.    The Complaint Was Properly Dismissed Because The Facts Properly Before The Court Precluded A Strong Inference Of Fraudulent Intent...................................42

    4.    The Absence Of A "Clear" Or "Obvious" Duty To Disclose Defeats Any Inference Of Scienter ...........................45

    5.    The Fact That Defendants Dramatically Increased Their Stock Holdings, And Are Not Alleged To Have Sold Any Shares, Refutes Any Inference Of Scienter ...........................50

    6.    The Complaint's Other Boilerplate Scienter Allegations Add Nothing To The Analysis And Are Contradicted By The Documents It Cites In Any Event....................................53

CONCLUSION ....................................................................56

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 2007 Novastar Fin. Inc. Sec. Litig.*,
  2008 WL 2354367 (W.D. Mo. June 4, 2008),
  *aff'd*, 579 F.3d 878 (8th Cir. 2009)............................................36, 41

*In re 2007 NovaStar Fin. Inc. Sec. Litig.*,
  579 F.3d 878 (8th Cir. 2009) .............................................21

*Adams v. Kinder-Morgan, Inc.*,
  340 F.3d 1083 (10th Cir. 2003) .........................................18

*In re Adolor Corp. Sec. Litig.*,
  616 F. Supp. 2d 551 (E.D. Pa. 2009)..................................52

*In re Alamosa Holdings, Inc.*,
  382 F. Supp. 2d 832 (N.D. Tex. 2005) ..........................41, 42

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005) ................................21

*Andropolis v. Red Robin Gourmet Restaurants, Inc.*,
  505 F. Supp. 2d 678 (D. Colo. 2007)..................................51

*Backman v. Polaroid Corp.*,
  893 F.3d 1405 (1st Cir. 1990)............................................46

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)...................................................22, 46

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004) ...........................16, 51

*Brogren v. Pohlad*,
  933 F. Supp. 793 (D. Minn. 1995)......................................51

*Burekovitch v. Hertz*,
  2001 WL 984942 (E.D.N.Y. July 24, 2001)........................31

iv

*Caprin v. Transp. Servs., Inc.*,
  99 F. App'x 150 (10th Cir. 2006) ...................................................38

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994)......................................................................17

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*,
  497 F.3d 546 (5th Cir. 2007) ........................................................55

*In re Centerline Holding Co. Sec. Litig.*,
  380 F. App'x 91 (2d Cir. 2010) ....................................................47

*In re Ceridian Corp. Sec. Litig.*,
  542 F.3d 240 (8th Cir. 2008) ........................................................55

*In re Cirrus Logic Sec. Litig.*,
  946 F. Supp. 1446 (N.D. Cal. 1996)..............................................42

*City of Omaha v. CBS Corp.*,
  2011 WL 2119734 (S.D.N.Y. May 24, 2011),
  *aff'd*, 679 F.3d 64 (2d Cir. 2012).................................................31

*City of Phila. v. Fleming Cos., Inc.*,
  264 F.3d 1245 (10th Cir. 2001) .......................................... *passim*

*City of Pontiac Emp. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*,
  806 F. Supp. 2d 1267 (N.D. Ga. 2011)...........................................21

*Cole v. Health Mgmt. Assoc., Inc.*,
  2009 WL 2713178 (M.D. Fla. July 17, 2009) .................................41

*Cozzarelli v. Inspire Pharms. Inc.*,
  549 F.3d 618 (4th Cir. 2008) ........................................................56

*In re Credit Acceptance Corp. Sec. Litig.*,
  50 F. Supp. 2d 662 (E.D. Mich. 1999) ...........................................41

*Dean Witter Reynolds, Inc. v. Howsam*,
  261 F.3d 956 (10th Cir. 2001) ........................................................4

*In re Digital Island Sec. Litig.*,
  357 F.3d 322 (3d Cir. 2004) ..........................................................53

*In re Donald Trump Casino Sec. Litig.*,
  793 F. Supp. 543 (D.N.J. 1992), *aff'd*, 7 F.3d 357 (3d Cir. 1993)......................31

*In re Downey Sec. Litig.*,
  2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ...................................................21

*Dronsejko v. Thornton*,
  632 F.3d 658 (10th Cir. 2011) ...............................................................15, 19, 40

*Druskin v. Answerthink, Inc.*,
  299 F. Supp. 2d 1307 (S.D. Fla. 2004)...................................................41, 42, 51

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976).........................................................................................13

*In re eSpeed, Inc. Sec. Litig.*,
  457 F. Supp. 2d 266 (S.D.N.Y. 2006) ...............................................................50

*In re Fannie Mae 2008 Sec. Litig.*,
  742 F. Supp. 2d 382 (S.D.N.Y. 2010) .........................................................37, 41

*First N.Y. Sec. LLC v. United Rentals Inc.*,
  391 F. App'x 71 (2d Cir. 2010) .........................................................................47

*In re First Union Corp. Sec. Litig.*,
  128 F. Supp. 2d 871 (W.D.N.C. 2001)..............................................................37

*In re FVC.com Sec. Litig.*,
  136 F. Supp. 2d 1031 (N.D. Cal. 2000),
  *aff'd*, 32 F. App'x 338 (9th Cir. 2002) .............................................................51

*Garfield v. NDC Health Corp.*,
  466 F.3d 1255 (11th Cir. 2006) .........................................................................55

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011) ...............................................................43

*Grossman v. Novell, Inc.*,
  120 F.3d 1112 (10th Cir. 1997) .........................................................................18

*In re Hansen Nat. Corp. Sec. Litig.*,
  527 F. Supp. 2d 1142 (C.D. Cal. 2007).......................................................42, 56

*Head v. NetManage, Inc.*,
    1998 WL 917794 (N.D. Cal. Dec. 30, 1998)......................................................41

*Hershfang v. Citicorp*,
    767 F. Supp. 1251 (S.D.N.Y. 1991) ............................................................27, 39

*In re HomeBanc Corp. Sec. Litig.*,
    706 F. Supp. 2d 1336 (N.D. Ga. 2010)............................................................41

*Hubbard v. BankAtlantic Bancorp, Inc.*,
    625 F. Supp. 2d 1267 (S.D. Fla. 2008)............................................................42

*In re Huntington Bancshares Inc. Sec. Litig.*,
    674 F. Supp. 2d 951 (S.D. Ohio 2009)....................................................36, 41, 42

*In re Hutchinson Tech., Inc. Sec. Litig.*,
    536 F.3d 952 (8th Cir. 2008) ............................................................................56

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*,
    537 F.3d 527 (5th Cir. 2007) .....................................................................41, 42

*In re Intelligroup Sec. Litig.*,
    527 F. Supp. 2d 262 (D.N.J. 2007)...................................................................42

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
    432 F. Supp. 2d 571 (E.D. Va. 2006) ...................................................36, 41, 52

*In re Jiangbo Pharms., Inc. Sec. Litig.*,
    884 F. Supp. 2d 1243 (S.D. Fla. 2012)......................................................29, 41

*In re JP Morgan Chase Sec. Litig.*,
    2007 WL 950132 (S.D.N.Y. Mar. 29, 2007),
    *aff'd*, 553 F.3d 187 (2d Cir. 2009)....................................................................40

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) .....................................................................19, 53

*L.L. Capital Partners, L.P. v. Rockefeller Ctr. Props., Inc.*,
    939 F. Supp. 294 (S.D.N.Y. 1996) ...................................................................46

*Lapiner v. Camtek, Ltd.*,
    2011 WL 445849 (N.D. Cal. Feb. 2, 2011)......................................................41

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
    2010 WL 5129524 (D. Colo. Dec. 10, 2010),
    *aff'd*, 667 F.3d 1331 (10th Cir. 2012)................................................................22

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
    667 F.3d 1331 (10th Cir. 2012) ........................................................................17

*In re Levi Straus & Co. Sec. Litig.*,
    527 F. Supp. 2d 965 (N.D. Cal. 2007)..............................................................36

*Malin v. XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007)...............................................................52

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
    833 A.2d 961 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004) ....................31

*Matrixx Initiatives, Inc. v. Siracusano*,
    131 S. Ct. 1309 (2011).............................................................................. *passim*

*McDonald v. Kinder-Morgan, Inc.*,
    287 F.3d 992 (10th Cir. 2002) ....................................................................32, 35

*McNamara v. Pre-Paid Legal Servs., Inc.*,
    189 F. App'x 702 (10th Cir. 2006) ..............................................................19, 53

*In re MELA Sciences, Inc. Sec. Litig.*,
    2012 WL 4466604 (S.D.N.Y. Sept. 19, 2012) ..................................................52

*Mizzaro v. Home Depot, Inc.*,
    544 F.3d 1230 (11th Cir. 2008) ........................................................................50

*In re MRU Holdings Sec. Litig.*,
    769 F. Supp. 2d 500 (S.D.N.Y. 2012) ..............................................................51

*Noble Asset Mgmt. v. Allos Therapeutics, Inc.*,
    2005 WL 4161977 (D. Colo. Oct. 20, 2005).....................................................23

*In re NutriSystem, Inc. Sec. Litig.*,
    653 F. Supp. 2d 563 (E.D. Pa. 2009)................................................................40

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.*,
    838 F. Supp. 2d 1148 (D. Colo. 2012)................................................................3

*Oppenheimer v. Novell*,
   851 F. Supp. 412 (D. Utah 1994)........................................................................51

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000) ................................................................................22

*Patel v. Parnes*,
   253 F.R.D. 531 (C.D. Cal. 2008)........................................................................21

*Payne v. DeLuca*,
   433 F. Supp. 2d 547 (W.D. Pa. 2006)..................................................................36

*In re PetSmart, Inc., Sec. Litig.*,
   61 F. Supp. 2d 982 (D. Ariz. 1999) .....................................................................51

*Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of
   Commerce*, 694 F. Supp. 2d 287 (S.D.N.Y. 2010).............................................39

*Prissert v. EMCORE Corp.*,
   894 F. Supp. 2d 1361 (D.N.M. 2012)..................................................................44

*Proter v. Medifast, Inc.*,
   2013 WL 1316034 (D. Md. Mar. 28, 2013) ........................................................42

*Pugh v. Tribune Co.*,
   521 F.3d 686 (7th Cir. 2008) ...............................................................................53

*In re REMEC, Inc. Sec. Litig.*,
   702 F. Supp. 2d 1202 (S.D. Cal. 2010)................................................................42

*Richman v. Goldman Sachs Grp., Inc.*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012) ...........................................................47, 48

*Rosenzweig v. Azurix Corp.*,
   332 F.3d 854 (5th Cir. 2003) ...............................................................................24

*In re Safeguard Scientifics*,
   2004 WL 2700291 (E.D. Pa. Nov. 18, 2004) ......................................................31

*Schwartz v. Celestial Seasonings, Inc.*,
   124 F.3d 1246 (10th Cir. 1997) .......................................................................2, 20

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ...............................................................................54

*Slater v. A.G. Edwards & Sons, Inc.*,
    -- F.3d --, 2013 WL 3390038 (10th Cir. July 9, 2013)........................................36

*Stamatio v. Hurco Cos.*,
    885 F. Supp. 1180 (S.D. Ind. 1995)....................................................................51

*Stern v. Leucadia Nat'l Corp.*,
    844 F.2d 997 (2d Cir. 1988) .........................................................................27, 39

*In re Sun Healthcare Grp., Inc. Sec. Litig.*,
    181 F. Supp. 2d 1283 (D.N.M. 2002)............................................................23, 51

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................. *passim*

*Thornton v. Micrografx, Inc.*,
    878 F. Supp. 931 (N.D. Tex. 1995) ....................................................................50

*In re UBS AG Sec. Litig.*,
    2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ...................................................41

*Unicorn Fin.-Corp. v. First Union Real Estate & Mortg. Invs.*,
    515 F. Supp. 249 (S.D. Ohio 1981) ..............................................................24, 26

*In re United Telecom. Sec. Litig.*,
    781 F. Supp. 696 (D. Kan. 1991)........................................................................51

*Utah Gospel Mission v. Salt Lake City Corp.*,
    425 F.3d 1249 (10th Cir. 2005) ...........................................................................4

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
    2008 WL 879023 (D. Colo. Mar. 28, 2008) .......................................................40

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) ................................................................44

*In re Wet Seal Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ..............................................................42

*Wolfe v. Aspenbio Pharma., Inc.*,
  2012 WL 4040344 (D. Colo. Sept. 13, 2012).......................................................43

*Zucco Partners LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) .......................................................41, 55

## Statutes

15 U.S.C.
  Section 78u-4(b)(1).........................................................................18
  Section 78u-4(b)(2).........................................................................16
  Section 78j(b)....................................................................... *passim*

## Other Authorities

17 C.F.R.
  Section 210.4-10(6)(i).....................................................................10
  Section 229.10b-5 ............................................................................1
  Section 229.303(a)(4)(ii)(A)-(D)....................................................35
  Section 229.404(a) ..........................................................................29

## Rules

Federal Rules of Civil Procedures
  Rule 4-10....................................................................................10, 35
  Rule 9(b) ................................................................................15, 17, 18
  Rule 10b-5...............................................................................1, 22, 46
  Rule 10b-5(b)...................................................................................50
  Rule 10b–5.......................................................................................45
  Rule 12(b)(6)................................................................................3, 18

## PRIOR OR RELATED APPEALS

None.

## STATEMENT OF THE ISSUES

The Consolidated Class Action Complaint (the "Complaint") did not satisfy the heightened pleading requirements imposed under the Private Securities Litigation Reform Act (the "Reform Act") for alleging securities fraud under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 229.10b-5, promulgated thereunder.

As the District Court properly held, the Complaint's allegations, considered "holistically" and "taken collectively" (ADD-6),[1] did not plead the requisite particularized facts demonstrating a "cogent and compelling" inference that any Defendant[2] acted with fraudulent intent, as required by the Reform Act, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), and controlling Tenth Circuit authority.

Although the District Court did not need to reach the issue, the judgment should also be affirmed because, in addition to failing to allege scienter, the Complaint does not comport with the Reform Act's specific requirements for

---

[1] "ADD-_" refers to the District Court's April 10, 2013 order granting Defendants' motion to dismiss, reproduced in the Addendum to Appellant's brief. "A-_" refers to Appellant's Appendix. "AB-_" refers to Appellant's brief. "SA-_" refers to Appellees-Defendants' Supplemental Appendix.

[2] Defendants-Appellees are collectively referred to as "Defendants." Movant-Appellant Ontario Teachers' Pension Plan, Plaintiffs Dvora Weinstein and Steven Weinstein, along with the other Movants, are collectively referred to as "Plaintiff."

pleading "falsity" under Section 10(b).[3]  Plaintiff further failed to allege falsity because the assertions regarding misstatements or omissions related to the Founder Well Participation Program ("FWPP") and Volumetric Production Payments ("VPPs") are refuted by the documents cited in the Complaint.

Because the judgment below can be affirmed on any ground supported by the record and applicable law, *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1254 (10th Cir. 1997), the case presents issues regarding the Complaint's defects in both pleading scienter, which provided the basis for the dismissal, and in pleading falsity, which were not addressed by the District Court:

1. Whether the judgment should be affirmed because the Complaint failed to comply with the Reform Act's requirements that it specify (i) each statement alleged to have been false or misleading, and (ii) the particularized reasons why each such statement was false or misleading.

2. Whether the judgment should be affirmed because, in addition to the failure to allege falsity in accordance with the Reform Act mandates, the Complaint failed to allege facts to show that any alleged misstatement violated any accounting or disclosure rule, or was otherwise false or materially misleading.

---

[3] Plaintiff asserts that the "District Court did not deny that the Complaint sufficiently pled materially false statements and omissions," as if to suggest that the District Court implicitly found that the Complaint sufficiently pled a material misstatement or actionable omission.  AB-2.  But as any reading of its opinion reveals, the District Court did not address -- or need to address -- falsity because dismissal was mandated by the Complaint's conspicuous failure to allege scienter. ADD 6-7.

3.  Whether the judgment should be affirmed because the Complaint failed to comply with the Reform Act's scienter requirement of pleading highly particularized facts demonstrating that specific misstatements were made with fraudulent intent.

4.  Whether the judgment should be affirmed because, apart from the failure to comply with the Reform Act's particularity requirements for pleading scienter, the Complaint failed to plead facts that, when viewed in context, support a strong inference of fraudulent intent.

Each of these issues encapsulates a separate and independent ground on which the Complaint failed to meet the standards necessary to avoid dismissal under the Reform Act and controlling case law.  As demonstrated below, Plaintiffs' attempts to convert media criticisms into securities fraud followed the pattern that prompted Congress to adopt rigorous and precise requirements for pleading falsity, and then scienter.  For that reason -- and others discussed below -- the Complaint fell <u>far</u> short on <u>both</u>.

## STATEMENT OF FACTS

The facts set forth in the Complaint and the documents properly before the District Court on Defendants' separate request for judicial notice (A-145-163; SA-1-228)[4] demonstrate that the Complaint failed to plead falsity or scienter with

---

[4] On a motion to dismiss pursuant to Rule 12(b)(6), "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on a Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  "[C]ourts may take judicial notice of the contents of SEC filings." *In*

respect to any alleged misstatement concerning the FWPP or VPPs.  They also show that Plaintiff has not dealt fairly with the District Court's opinion, or the GAAP and disclosure regulations referred to in the Complaint.

## A.        THE DISTRICT COURT'S RULING

The District Court dismissed the Complaint for failing to plead any Defendant's scienter with the requisite particularized facts.  ADD-6-7.  Plaintiff argues that the dismissal was flawed because the District Court demanded "smoking gun" evidence and "fail[ed] to consider all of the Complaint's scienter allegations collectively, as required by *Tellabs* . . . ."  AB-5, 22.

In fact, the District Court made plain that it had "assessed plaintiff's allegations holistically," and based on that holistic assessment concluded that "taken collectively," the Complaint's allegations did not give rise to a "cogent and compelling" inference of scienter.  ADD-6 (emphasis added).  The District Court did not dismiss the Complaint for lacking "smoking gun" evidence, but because "[t]hroughout the Complaint," Plaintiff made "generalized, conclusory allegations regarding scienter without any specific corroborating details," and thus failed to

---

re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 838 F. Supp. 2d 1148, 1156 (D. Colo. 2012).  Moreover, "a document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss," *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253-54 (10th Cir. 2005), even "if a plaintiff does not [expressly] incorporate by reference or attach a document to its complaint," *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001).

4

allege the required "particularized factual allegations that would give rise to a strong inference of scienter." *Id.*

Similarly, Plaintiff asserts that the District Court "did not conclude that the Complaint had failed to plead materially false statements." AB-2. In fact, the District Court never even reached the issue of "falsity," because it dismissed the Complaint solely on its conspicuous failure to allege scienter. ADD 6-7.

## B.    DISCLOSURES REGARDING THE FWPP AND VPPS

As any reasonable review of the relevant GAAP provisions and disclosure guidelines makes clear, Chesapeake's treatment of the FWPP and VPPs was fully compliant. Those programs have been in place for many years. They have been the subject of repeated audits by a "Big Four" accounting firm and multiple SEC reviews. Neither has ever suggested that there was anything incomplete or wrong -- much less fraudulent -- with respect to the manner in which Chesapeake dealt with any aspect of the FWPP or its VPPs. Accordingly, Plaintiff is forced to fall back on ill-informed media speculation.

### 1.    THE FOUNDERS WELL PARTICIPATION PROGRAM

Beginning in 1993, McClendon had the contractual right to purchase a 2.5% interest in all gas wells drilled by Chesapeake during a given calendar year. A-14, ¶41; SA-63-66, 73-74. In 2005, this right was approved by shareholders in the form of the FWPP. *Id.*

In sharp contrast to Plaintiff's repeated assertions that McClendon had "no skin in the game" and was granted a "risk free option" because he purportedly purchased all of his FWPP interests via non-recourse loans during the alleged class period (AB-16-18), McClendon had been purchasing such interests for nearly two decades before the financing transactions referred to in the Complaint.  SA-63-66, 73-74.

Plaintiff's repeated pronouncements that McClendon "got a free ride" and was motivated to initiate a "land grab" strategy that misaligned his interests with the interests of the Company (AB-16-18), are similarly baseless.  Under the FWPP McClendon was required to (i) purchase an interest in either "all or none of the wells" Chesapeake drilled in a given year (A-14, ¶ 41), and (ii) to pay <u>all</u> of the costs associated with his portion of the wells.[5]  A-132-35; SA-63-66, 73-74, 81-82, 99-100, 107-109.

The FWPP is not a form of compensation.  McClendon is required to pay for the FWPP interests he has purchased, including <u>all</u> associated costs, which have exceeded his revenues by a wide margin.  *See, e.g.*, SA-64, 99-100, 159.  During the class period, the FWPP caused McClendon negative cash flows of

---

[5] The claim that the Company terminated the program before its expiration (AB-43) is false.  The Company renegotiated the duration of the FWPP (from December 2015 to December 2014), with Mr. McClendon's consent.  *See* Chesapeake Energy Form DEF 14A, filed May 11, 2012 ("The Board and [McClendon] voluntarily renegotiated the terms of the FWPP to provide for early termination on June 30, 2014 . . . ").

$116,093,575 in 2009, $141,877,012 in 2010, and $315,337,312 in 2011.  A-133; SA-159.

As Chesapeake repeatedly disclosed, McClendon's FWPP interests are his personal assets -- he has spent millions of dollars each year since 1993 to acquire and maintain them.  A-27, ¶ 3; A-134-135; SA-100, 109.  As Chesapeake further disclosed throughout the alleged class period, the "FWPP does not restrict [McClendon's] sales, other dispositions or financing transactions involving FWPP interests" (SA-86, 99-100, 109), and McClendon in fact "sold FWPP interests in conjunction with sales by the Company" and engaged in "personal financing transactions . . . with respect to certain of his interests in the Company's wells." A-135; SA-82, 86-87, 94, 99-100, 109.

Chesapeake is not alleged to have been, nor was it ever, a party to any of McClendon's financing transactions related to his personal FWPP interests.[6]  A-135.  Despite that indisputable fact, Plaintiff's <u>brief</u> proceeds as if there were facts establishing that a conflict of interest had occurred.  There are not.  The best the Complaint (and media speculation it cites) can do on that score is to allege that

---

[6] The Complaint notes that before the filing of this suit, Chesapeake announced that its Audit Committee would review McClendon's personal financing transactions.  A-64, ¶ 116.  That review was conducted by independent directors with the aid of independent counsel.  On February 20, 2013, the Company announced that no wrongdoing was found.  *See* http://www.sec.gov/Archives/edgar/data/895126/000089512613000069/chk02202 013_991.htm.

there were <u>potential</u> conflicts.  A-54, ¶ 83; A-57-58, ¶ 94; AB-19.  Although not part of the record on appeal, the Court can take judicial notice of the fact that the SEC investigation Plaintiff seeks to exploit has not resulted in any charges against any Defendant.

### 2.  VOLUMETRIC PRODUCTION PAYMENTS

Chesapeake utilized volumetric production payments, or VPPs, throughout the class period and well before.[7]  VPPs are a species of sales transactions that are accounted for according to specific GAAP provisions and SEC rules.  In conformance with those proscriptions, they are reflected on the balance sheet at the time of the sale.

Because VPPs do not constitute debt, there is no debt or liability to place on the balance sheet. The <u>only</u> future obligation or expense associated with VPPs is production costs that will be incurred if and when oil or natural gas is produced and delivered to the VPP counterparty.  *See, e.g.*, SA-115 (VPP is sold "free and clear of all associated future production costs and capital expenditures" but is otherwise "nonrecourse to the seller," Chesapeake).

---

[7] A VPP "is a limited-term overriding royalty interest in natural gas and oil reserves that (i) entitles the purchaser to receive scheduled production volumes over a period of time from specific lease interests; (ii) is free and clear of all associated future production costs and capital expenditures; (iii) is non-recourse to the seller (i.e., the purchaser's only recourse is to the reserves acquired); (iv) transfers title of the reserves to the purchaser; and (v) allows the seller to retain the remaining reserves, if any, after the scheduled production volumes have been delivered."  SA-115.

Pursuant to the applicable GAAP provisions and SEC guidance, Chesapeake reduced the value of proved reserves on the balance sheet by the amount of cash received at the time of each VPP sale. *See, e.g.*, SA-134-135, 147-148. As required by GAAP and the applicable SEC provisions, the operating costs associated with producing the oil and gas sold via the VPP were included in the Company's financial statements, along with the Company's other production costs. *See, e.g.*, SA-165-166, 172, 179, 186, 194, 206. Chesapeake also included the projected costs of producing the oil and gas in its guidance for future operating costs. A-161.[8]

In addition to complying with the explicit GAAP and SEC directives, Chesapeake disclosed a wealth of information regarding each individual VPP. Such information included, throughout the alleged class period, the date of the transaction, the region, the dollar amount of the proceeds received (reflected on the balance sheet), the volume of proved reserves to be delivered (subtracted from proven reserves on the balance sheet), the period over which such volumes are to be produced, and the fact that Chesapeake bears the cost of the production costs

---

[8] *See, e.g.*, SA-209 (noting that updated guidance "includes estimated production decreases . . . associated with potential…VPP and other monetization transactions"); SA-166 (updating forecast based in part on new VPP); SA-172 (noting that "guidance has been updated to reflect…anticipated [VPP] transactions in 2009 and in 2010"); SA-179 (same); SA-186 (updating forecast based on updated "asset monetization projections" and cost assumptions); SA-194 (noting that updated guidance has incorporated "the anticipated closing of VPP #9," "increased drilling and completion costs" and updated "[c]ost assumptions").

associated with the VPP. A-138; *see, e.g.*, SA-125, 138, 151. Chesapeake's extensive disclosures also included detailed explanations showing the reduction from proved reserves attributable to VPPs during the applicable period. *See, e.g.*, SA-121-122, 134-35, 147-148.

Chesapeake's accounting for VPPs conformed with -- and was dictated by -- Rule 4-10 of Regulation S-X, which governs financial accounting and reporting for oil and gas producing activities accounted for under the full cost method.[9] The Company reported the cash proceeds from these transactions as a reduction of natural gas and oil properties with no gain or loss recognized, and reduced its proved reserves. 17 C.F.R. § 210.4-10(6)(i); *see, e.g.*, SA-138 ("For accounting purposes, cash proceeds from [VPP] transactions were reflected as a reduction of natural gas and oil properties with no gain or loss recognized, and our proved reserved were reduced accordingly.").

Significantly, the linchpin of Plaintiff's current attempt to circumvent these facts -- *i.e.*, that the operational costs associated with the VPPs are "liabilities" or "debt" -- has been disavowed by Plaintiff itself  in the course of the proceedings in

---

[9] Indeed, in determining what the proper accounting for the VPPs should be, Chesapeake followed the guidance given in its outside auditor's (PwC) publication, "Petroleum Accounting - Principles, Procedures & Issues." SA-224.

the District Court.  In its appellate brief[10] and Complaint,[11] Plaintiff repeatedly refers to the VPPs as involving "liabilities" that are in essence "debt."  When confronted with the fact that the operating costs associated with the VPP sales are neither liabilities nor debt, Plaintiff's Opposition to Defendants' Motion to Dismiss conceded that VPPs "do <u>not</u> constitute debt and thus do not create any debt or liability to place on the balance sheet."  A-186 (emphasis added).

Plaintiff got it right in the District Court.  No one -- not the SEC, not the Company's outside auditors nor anyone else -- has <u>ever</u> suggested that the Company has to restate its financial statements to account for these purportedly "concealed" "debts" or "liabilities."  Indeed, the Company's outside auditors repeatedly issued unqualified audit opinions throughout the class period (SA-118, 131, 144), and the SEC never required any revision of the Company's accounting or disclosures regarding the VPPs.[12]

---

[10] *See, e.g.*, AB-4 (VPPs are "key liabilities"); AB-11 (Defendants were "concealing the significant [VPP] liabilities"); AB-12 (the VPPs are "contractual liabilities that [are] no different than debt").

[11] *See, e.g.*, A-30, ¶ 12 ("through the VPPs, Chesapeake concealed at least $1.4 billion in off-balance sheet liabilities"); A-31, ¶ 13 ("the VPP liabilities").

[12] The notion that the VPPs were vehicles through which Defendants concealed "debt" or "liabilities," and increased the Company's "debt load" (*see, e.g.*, A-30-31, ¶¶ 12-13; A-50, ¶¶ 71-72; AB-12-13), is further refuted by the fact that the Company "has sold approximately 1.37 trillion cubic feet of natural gas equivalent (tcfe) of proved reserves [via VPPs] for combined proceeds of approximately $6.4 billion, or approximately $4.65 per mcfe, which is

C.      **THE INDIVIDUAL DEFENDANTS DRAMATICALLY INCREASED THEIR CHESAPEAKE STOCK HOLDINGS DURING THE CLASS PERIOD**

As discussed below, the Complaint does not (and cannot) allege <u>any</u> of the facts that typically accompany claims of securities fraud -- *e.g.*, a major financial restatement, an auditor resignation, a stock offering or stock merger providing a significant incentive to inflate the company's stock price, or large suspiciously timed stock sales by those accused of perpetrating the fraud. Moreover, during the alleged class period, the individuals who would have been central to the purported securities fraud increased -- rather than sold -- their Chesapeake stock holdings. None of the individual Defendants "bailed out of," or <u>even</u> <u>sold</u> Chesapeake stock during the class period. To the contrary, McClendon's stock holdings increased by <u>48.95%</u>; Mr. Dell'Osso's holdings increased by <u>277.34%</u>; and Mr. Hood's holdings increased by <u>61.46%</u>.[13] Chairman/CEO McClendon and CFO Dell'Osso made open market purchases of Chesapeake stock totaling almost two million

---

approximately <u>300% more</u> than the company's current drilling and completion cost per mcfe." SA-204 (emphasis added).

[13] *See* SA-3-4, 23-24 (indicating that as of 4-2-09, the date of the last Form 4 filed before the start of the class period, McClendon held 2,186,993 shares, and as of 4-3-12, the date of the last Form 4 filed during the class period, he held 3,257,614 shares); SA-27-28, 40-41 (indicating that as of 11-9-10, the date of the first Form 3 filed by Dell'Osso, he held 94,203 shares, and as of 4-3-12, the date of the last Form 4 filed during the class period, he held 355,471 shares); SA-52-53, 56-57 (indicating that as of 4-2-09, the date of the last Form 4 filed before the start of the class period, Hood held 444,860 shares, and as of 4-3-12, the date of the last Form 4 filed during the class period, he held 718,275 shares).

dollars between them during the class period.  SA-7-8, 11-12, 15-16, 19-20, 32-33, 36-37.

## SUMMARY OF THE ARGUMENT

The Complaint presents a paradigm example of the type of stock drop case that Congress targeted for dismissal when it adopted elevated standards for pleading falsity and scienter in the Reform Act.  Accordingly, the judgment should be affirmed (1) on the scienter grounds relied upon by the District Court, which mooted consideration of the falsity allegations, and (2) on falsity grounds that the District Court did not reach, but which are equally supported by the record and applicable law, and independently dispositive.

As the District Court correctly determined, the Complaint failed to plead particularized facts giving rise to a strong inference of scienter, which is defined by the Supreme Court as a "mental state embracing intent to deceive, manipulate or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  That is true both because Plaintiff failed to plead scienter with the requisite particularity, and because, irrespective of particularity, the allegations of the Complaint could not give rise to a strong inference of fraudulent intent when considered "holistically" with the other facts properly before the District Court on Defendants' Motion to Dismiss.

While the failure to plead scienter is decisive, the judgment should also be affirmed because the Complaint failed to plead falsity. Like the scienter defects, the failure to plead falsity is multifaceted. First, the Complaint fails to satisfy the Reform Act's mandate that the Complaint identify each specific statement alleged to have been false or misleading, and then state particularized facts demonstrating why each such statement is false or misleading. Second, Plaintiff's falsity allegations fail because they are refuted by information included in the public filings cited in the Complaint, and by the rules Plaintiff cites as support for its assertions that the underlying disclosures were defective.

Rather than identifying specific statements and stating the specific reasons why the individual statements are actionable, the Complaint adopts a "puzzle pleading" formula that seeks to evade those statutory requirements. It simply juxtaposes a laundry list of out-of-context quotations from multiple sources against a conclusory list of "true facts" without attempting to connect the two. Numerous cases have condemned such evasive tactics and dismissed Section 10(b) cases for failure to comply with the Reform Act.

Apart from that fatal procedural defect, the Complaint fails to allege falsity on a variety of substantive grounds, most of which can be traced to mischaracterizations of Chesapeake's public filings, federal disclosure rules, or both. Most of what Plaintiff claims should have been disclosed was, in fact,

disclosed, and Plaintiff can cite no authority to show Chesapeake had any legal duty to disclose more.

This two-pronged failure to allege falsity requires dismissal without reference to scienter, but it also adds to the many reasons that the Complaint was properly dismissed because it fell far short of meeting the Reform Act's rigorous scienter standards. Although scienter can never be alleged by simply second guessing complex GAAP or financial reporting requirements, *see, e.g.*, *Dronsejko v. Thornton*, 632 F.3d 658, 669 (10th Cir. 2011), the allegations of the Complaint do not even cross <u>that</u> threshold.

The Reform Act requires highly particularized facts showing that each defendant acted with fraudulent intent, and supporting a strong inference of that intent. The "facts" alleged in the Complaint establish neither. Rather than attempting to satisfy the Reform Act's exacting standards, Plaintiff lumps the Defendants together and seeks to "impute" scienter to all of them on the basis of their positions at the Company.

In contrast to the requirements of Fed. R. Civ. P. 9(b), and the more demanding standards imposed under the Reform Act, the Complaint contains no specific allegations -- no dates, times, places -- to show that any Defendant was aware of any false or contradictory information, <u>much</u> <u>less</u> that any Defendant knew that not disclosing the information violated some legal duty or would render

some affirmative statement materially misleading.  The absence of such particularized facts required dismissal for failure to meet the Reform Act's particularity requirements with respect to specific statements, the reasons specific statements were false and misleading, and that "the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Even if the allegations within the four corners of the Complaint satisfied the Reform Act's rigorous particularity requirements (and they do not come close), the Complaint would fail because a "holistic" analysis of all of the facts, "taken collectively," refutes any inference that the Defendants acted with a mental state embracing intent to deceive, manipulate or defraud -- rather than establishing its strength.  There is no financial restatement, or allegation of wrongdoing by the SEC or Department of Justice.  Nor did the Defendants profit from any purportedly fraudulent "inflation" in Chesapeake's stock price, whether via a stock offering, stock merger or individual sales of substantial amounts of stock.  Indeed, the individuals Plaintiff blithely accuses of fraud actually increased their Chesapeake stock holdings during the class period, "a fact wholly inconsistent with fraudulent intent."  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).

16

## ARGUMENT

As the Supreme Court has repeatedly emphasized, securities class actions present "'a danger of vexatiousness different in degree and kind from that which accompanies litigation in general.'"[14]  Because such cases "can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law,"[15] Congress rewrote the securities laws to ensure dismissal of stock drop complaints that fail to meet exacting pleading standards.

As the Conference Committee Report accompanying the Reform Act states, the statute was "prompted by significant evidence of abuse in private securities lawsuits," including "the routine filing of lawsuits against securities issuers and others whenever there is a significant change in the issuer's stock price . . . ."  H.R. Conf. Rep. No. 104-369, at 31 (1995).  Congress further determined that Rule 9(b) had "not prevented abuse of the securities laws by private litigants," and stated that it was establishing "more stringent pleading requirements to curtail the filing of meritless lawsuits."  *Id.* at 42.

### A.    THE REFORM ACT'S HEIGHTENED STANDARDS FOR PLEADING SECURITIES FRAUD

Accordingly, a plaintiff alleging securities fraud "bears a heavy burden at the pleading stage."  *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333

---

[14] *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 189 (1994).

[15] *Tellabs, Inc. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313 (2007).

(10th Cir. 2012). Even before the Reform Act, "[c]ourts d[id] not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) . . . where the plaintiff[s] ha[d] failed to allege with particularity circumstances that could justify an inference of fraud under Rule 9(b)." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997). The Reform Act imposed far more rigorous pleading requirements, and mandates dismissal of complaints that fail to measure up. *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1258-59 (10th Cir. 2001).

Under the Reform Act, a Section 10(b) complaint must (1) specify each statement alleged to have been misleading and (2) the reasons why the statement is misleading. 15 U.S.C. § 78u-4(b)(1). If, as in this case, the "falsity" allegations are made on information and belief, the complaint must state "all facts" on which the belief is based "with particularity." *Id.*

In addition to alleging falsity in conformance with those elevated standards, the complaint must "state with particularity facts giving rise to a strong inference" that the defendant(s) making the identified statement did so with scienter. *Id.* § 78u-4(b)(2).

The Tenth Circuit has echoed the Supreme Court in holding that scienter under Section 10(b) requires "a mental state embracing intent to deceive, manipulate, or defraud, or recklessness." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003) (quotations omitted). "Recklessness" in this context

means "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Fleming*, 264 F.3d at 1260 (quotations omitted).  Consistent with the broader definition of scienter, recklessness under Section 10(b) is "akin to <u>conscious</u> disregard"; gross negligence does not suffice.  *Dronsejko v. Thornton*, 632 F.3d 658, 668 (10th Cir. 2011) (emphasis added).

Even when supported by particularized facts, an inference of fraudulent intent cannot be "strong" unless it is "powerful," "cogent" and "compelling". *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007).  The complaint must satisfy this requirement in the context of all of the facts and circumstances, taking into account facts and inferences that tend to undercut any inference of fraudulent intent.  *Id.*

Thus, for example, when the allegations of fraud are made in a context in which the defendants did not benefit economically from the purported fraud, such as when defendants acquired, rather than sold, stock at "inflated" prices, the complaint "does not yield a reasonable inference of fraudulent intent," much less one that is cogent, compelling or strong.  *Kalnit v. Eichler*, 264 F.3d 131, 140-41 (2d Cir. 2001) (quotations omitted); *see, e.g.*, *McNamara v. Pre-Paid Legal Servs., Inc.*, 189 F. App'x 702, 718 (10th Cir. 2006) (affirming dismissal on scienter

grounds since complaint's allegations failed to demonstrate that fraud was "economically logical" in light of defendants' stock purchases at "allegedly inflated prices").

## B.    THE COMPLAINT'S "PUZZLE PLEADING" APPROACH VIOLATES EXPLICIT PROVISIONS OF THE REFORM ACT

Under well-settled law, this Court may affirm the judgment below "for any reason supported by the record," irrespective of whether the District Court addressed the issue. *Schwartz.* 124 F.3d at 1254. In this case the Complaint fails to clear a statutory threshold that would require affirmance entirely apart from its other fatal defects.

Although Plaintiff was obligated by statute to specify with particularity each statement alleged to have been misleading, the reason(s) why the statement is misleading and all facts on which that belief is formed, the Complaint utterly fails to do so. Instead, it provides a table listing twenty SEC filings that supposedly contain false or misleading statements,[16] reproduces long (and often out of context) block quotes of text from some of those filings and a variety of press releases, conference call transcripts and news articles,[17] and then, without identifying the specific statements that were supposedly false or misleading, offers a laundry list

---

[16] A-40-41, ¶ 121.

[17] A-41-64, ¶¶ 122-31, 133-41, 143-58, 160-76.

of over a dozen conclusory "true facts."[18]   "This practice does not satisfy the PSLRA's requirement of pleading with sufficient particularity."   *In re 2007 NovaStar Fin. Inc. Sec. Litig.*, 579 F.3d 878, 883 (8th Cir. 2009).[19]

In contrast to the plain statutory language, the Complaint fails to specify which portions of the listed SEC filings or lengthy quotations are supposedly inconsistent with any purported "true fact,"[20] state which specific statements link up with which "true facts," or state the reasons that any identified statement is false or materially misleading.  Instead, "Plaintiff[s] ha[ve] placed 'the burden on the [reader] to sort out the alleged misrepresentations and then match them with the corresponding adverse facts."   *Alcatel*, 382 F. Supp. 2d at 534 (dismissing similarly-pled complaint); *see, e.g.*, *City of Pontiac Emp. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*, 806 F. Supp. 2d 1267, 1293 (N.D. Ga. 2011) (same).

---

[18] A-45, ¶ 132; A-50-51, ¶ 142; A-56-57, ¶ 159; A-64-65, ¶ 177.

[19] *See, e.g.*, *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) ("Plaintiffs list various statements -- often setting forth lengthy quotations from various releases by Defendants' officers and securities analysts -- then follow each with a similar (in most cases identical) laundry list of 'specific' reasons why the statements are allegedly false. . . . This method is deficient under the [PSLRA's] pleading standards." (emphasis added)).

[20] Although a few sentences are emphasized in bold and italicized text, the Complaint provides no "explanation as to why any of the sentences were bolded and highlighted or what the bolded and highlighted material means or represents." *In re Downey Sec. Litig.*, 2009 WL 2767670 at *3 (C.D. Cal. Aug. 21, 2009) (dismissing similarly-pled complaint); *see also Patel v. Parnes*, 253 F.R.D. 531, 552 n.192 (C.D. Cal. 2008) (same).

"Such 'puzzle pleading' is an improper means of pleading a claim" under the Reform Act, and the judgment must be affirmed on this basis <u>alone</u>. *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 2010 WL 5129524, at *9 (D. Colo. Dec. 10, 2010), *aff'd*, 667 F.3d 1331, 1339 n.8 (10th Cir. 2012) ("We join in [the district court's] disapproval" of this method of pleading).

## C.      THE COMPLAINT DOES NOT ALLEGE A MATERIAL MISSTATEMENT OR ACTIONABLE OMISSION IN ANY EVENT

Much of Plaintiff's brief reads as if public companies have a duty to disclose all material information in their possession. But that is not the law. Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321 (2011). "[N]on-disclosure of material information will not give rise to liability . . . unless the defendant had an affirmative duty to disclose that information." *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000). "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17 (1988).

As described below, there is no legal requirement to disclose the information Plaintiff claims was improperly omitted. To the contrary, documents properly before the District Court affirmatively establish that Chesapeake's public statements regarding both the FWPP and its use of VPPs were complete, accurate and in conformity with existing federal disclosure obligations.

1.          **THE COMPLAINT'S FWPP DISCLOSURE ALLEGATIONS ARE UNTETHERED TO THE FACTS OR THE LAW**

The Complaint alleges Chesapeake made actionable misstatements about the FWPP by (1) falsely claiming it "aligned" the Company's interests with McClendon's (A-39-40, ¶¶ 42-45; A-53-55, ¶¶ 82-85), and (2) failing to disclose McClendon's mortgaging of his personal FWPP assets as part of a "related party" transaction.  A-40-45, ¶¶ 45-56.  Putting aside the fact that -- as shown below -- Chesapeake <u>did</u> disclose the fact that McClendon mortgaged his FWPP assets, these allegations fail in light of both the relevant federal disclosures rules and the actual text of Chesapeake's disclosures.

a.          **THE STATEMENTS REGARDING THE FWPP'S "ALIGNMENT OF INTERESTS" CONSTITUTE NON-ACTIONABLE SUBJECTIVE STATEMENTS, AND WERE ACCURATE IN ANY EVENT**

Chesapeake's descriptions of the FWPP -- *i.e.*, that it "aligned" McClendon's interests with the Company's (A-73-74, ¶¶ 136-138) -- "are subjective evaluations that are not material and cannot form the basis of a securities fraud complaint."  *Noble Asset Mgmt. v. Allos Therapeutics, Inc.*, 2005 WL 4161977, at *11 (D. Colo. Oct. 20, 2005); *see, e.g.*, *In re Sun Healthcare Grp., Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1291 (D.N.M. 2002) (statements were inactionable because "[i]t would be impossible to objectively verify such soft statements that merely convey the subjective assertions of the speaker").

Chesapeake "was under no duty to cast [FWPP alignment] in a pejorative, rather than a positive, light," *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003), and disclosures "do not mislead a shareholder because they fail to state an interpretation . . . the defendants do not share." *Unicorn Fin.-Corp. v. First Union Real Estate & Mortg. Invs.*, 515 F. Supp. 249, 261 (S.D. Ohio 1981).

Moreover, Plaintiff's "misalignment-of-interests" assertion is premised on a fundamental misportrayal of Chesapeake's SEC filings.  That fact is evident from beginning to end, starting with Plaintiff's claim that Chesapeake initiated a program of touting the FWPP as aligning McClendon's interests during the alleged class period following the forced sale of his margined stock.  A-38-39, ¶ 40.  The same alignment statements were set forth in the Company's SEC filings year after year (with good reason) beginning <u>long</u> <u>before</u> the class period.  SA-63-66, 73-74, 81-82, 99-100, 107-109.

For example, Plaintiff asserts that the FWPP was the "centerpiece" of a "campaign" started in 2009 to reassure shareholders and "tie McClendon's principal compensation to the Company's gas and oil wells."  A-39, ¶ 41; *see also* AB-15.  In fact, as Chesapeake disclosed throughout the class period, McClendon's well participation began in 1993, and the FWPP was

overwhelmingly approved by shareholders in 2005.[21]  *See* A-14, ¶ 41; SA-63-66, 73-74, 81-82, 98-100, 107-109.

Nor is the FWPP a form of compensation, as Plaintiff proclaims.  *See, e.g.*, AB-15.  McClendon has always been required to pay for his FWPP interests, and his FWPP costs exceeded his revenues by a wide margin.  *See, e.g.*, SA-64, 100, 159.

Plaintiff's claim that the FWPP failed to align interests because McClendon does not bear a proportionate share of acquisition and exploration costs, and "is responsible for costs only if a well was successfully drilled,"[22] is particularly egregious.   The follow-on assertion that McClendon's "financial interests were in conflict with Chesapeake's" because it allowed him to perpetrate a "'land grab' strategy for personal gain" (AB-16), is similarly inexcusable.

As the SEC filings cited in the Complaint themselves make clear, McClendon was required to participate in all wells or none, successful or not.  *See, e.g.,* SA-108 (McClendon is required to "participate in all wells spudded by or on behalf of the Company during the given calendar year and cannot elect to

---

[21] The full terms of the FWPP, including McClendon's right to mortgage his well interests, were disclosed to shareholders prior to the programs' approval.  SA-63-66.

[22] A-28, ¶ 6; *see also* A-53-54, ¶ 82 (asserting that McClendon participates "only in the good acreage," "gets better opportunities," and shares in the "boons" while avoiding the "banes").

participate on a well-by-well basis.").  He was also required to pay <u>all</u> costs associated with the wells, including the costs of acquiring the land and conducting exploration activities -- not just the cost of drilling and production, and not just the land acquisition costs related to successful wells.  *Id*.[23]

Plaintiff further asserts that "McClendon did not put any of his personal assets at risk" by mortgaging his personal FWPP assets, and thus had no "skin in the game."  A-28, ¶ 5; A-41, ¶ 46.  Once again, as Chesapeake's SEC filings establish the opposite.  McClendon's FWPP interests are his <u>personal</u> assets, and he has spent millions of dollars each year since 1993 to acquire and maintain them.[24]  *See* A-27, ¶ 3; SA-64-64, 100, 107, 109.  As Plaintiff acknowledges, by the end of the Class Period, "<u>McClendon's FWPP interest[s] [were] valued at over</u>

---

[23] "The FWPP provides that the amount paid by Mr. McClendon for acreage assigned in connection with his participation in the FWPP is to be recomputed as of the first day of each calendar year and is equal to a fully costed average per acre amount computed as follows: (i) <u>direct costs</u> capitalized in the appropriate accounting pool in accordance with the Company's accounting procedures (<u>including all capitalized interest, leasehold payments, acquisition costs, landman charges and seismic charges</u>); divided by (ii) the acreage in the applicable pool at the time of computation.  The annual computation allows the Company to reflect the acreage and costs with respect to newly acquired acreage; acreage sold by the Company and acreage that has expired.  All other costs are billed in accordance with the Company's accounting procedures…and such amounts paid by Mr. McClendon . . . is on no better terms than the terms agreed to by unaffiliated third party participants . . . ."  SA-99, 108 (emphasis added).

[24] They were not, as alleged in the Complaint, "acquired" in their "entirety" via financing transactions during the alleged Class Period.  A-41, ¶46.

$400 million . . . [and] comprised substantially all of McClendon's personal financial interest in the Company." AB-15 (emphasis added).

Nor were McClendon's FWPP interests "fully financed" by non-recourse financing transactions, as Plaintiff asserts. AB-17. As the Complaint acknowledges, those transactions occurred during the Class Period (A-28, ¶ 5), whereas McClendon's FWPP interests go back nearly two decades. SA-63-66, 73-74. Mortgaging his substantial personal assets, and risking almost 20 years of personal investment and its potential upside, certainly counts as having "skin in the game."[25]

### b.    CHESAPEAKE DISCLOSED THAT MCCLENDON MORTGAGED HIS PERSONAL FWPP ASSETS

The lack of merit in Plaintiff's repeated statements that McClendon mortgaged his personal FWPP assets with "hidden loans" (AB-34) and "secret debts" (A-53, ¶ 81), is similarly exposed by Chesapeake's repeated disclosures that

---

[25] In the alternative, Plaintiff argues Chesapeake was required to disclose McClendon's FWPP loans because they were borrowed from some of Chesapeake's same lenders (A-52-53, ¶¶ 78-79), and "appear[] to be a *quid pro quo* for the Company's business." A-56, ¶ 89. Yet the Complaint is devoid of any factual allegations to support this accusation, instead relying on news articles speculating about "potential conflicts of interests" (A-57-58, ¶ 94) and the "theoretical possibility of a conflict of interest." A-57, ¶ 92. "It is not enough to quote press speculation about defendants' motives and press reports." *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1004 (2d Cir. 1988). A "complaint must rise or fall on allegations about defendants' conduct, and not on wide-eyed citation to the gratuitous commentary of outsiders." *Hershfang v. Citicorp*, 767 F. Supp. 1251, 1255 (S.D.N.Y. 1991) (emphasis added).

the "FWPP does not restrict [McClendon's] sales, other dispositions <u>or financing</u> <u>transactions</u> involving FWPP interests."   A-135; SA-86, 99-100, 109 (emphasis added).   During the alleged class period, Chesapeake further disclosed that McClendon <u>made "personal financing transactions . . . with respect to certain of his</u> <u>interests in the Company's wells</u>."   SA-82, 86-87, 94, 99, 109.   As one of the articles cited in the Complaint explicitly states:  "[I]nvestors <u>have known for years</u> that McClendon has borrowed against or sold portions of his stakes."   A-155 (emphasis added).

c.        **RELATED PARTY DISCLOSURE REQUIREMENTS ONLY GOVERN TRANSACTIONS WHERE THE REGISTRANT IS A PARTICIPANT**

Even though McClendon's mortgaging of his FWPP assets was public knowledge, Plaintiff counters that Chesapeake was required to disclose the "<u>magnitude</u> of the hidden loans" pursuant to the "related party" disclosure requirements of Regulation S-K Item 404(a) and GAAP.  *See* AB-34, 40-42.  That assertion is, again, contradicted by the documents cited to support it.

As the Complaint acknowledges, a related party disclosure obligation under Item 404(a) arises <u>only</u> when there is a "transaction" in which "the registrant <u>is a</u>

participant," and "in which any related person had or will have a direct material

interest."[26] A-43, ¶ 52 (emphasis added).  In other words,

> Item 404(a) contains a two-part trigger for officers' and directors'
> obligation to report a material transaction.  The reporting requirement
> applies if (1) the officer or director has a material interest <u>and</u> (2) <u>the
> company is directly involved in the transaction as a party</u>.

Thomas L. Hazen, *Treatise on the Law of Securities Regulation* § 9.4[8][D] (6th

ed. 2009) (second emphasis added).

The Complaint does not (and cannot) allege that Chesapeake -- the registrant

-- participated in or was a party to McClendon's FWPP loan transactions.[27]

McClendon's FWPP well interests are his personal assets.  SA-99-100, 109.  The

loans were extended by third-party lenders and are collateralized by his personal

property -- <u>not</u> property owned by Chesapeake.  Accordingly, Plaintiff's assertion

that Item 404(a) obligated Chesapeake to disclose the details of McClendon's

personal loans is without legal basis.[28]  *See, e.g.*, *In re Jiangbo Pharms., Inc. Sec.*

---

[26] Item 404(a) requires "the registrant" -- in this case, Chesapeake -- to
describe transactions with "any related person[s]," which are defined in the
instructions to include "any director or executive officer of the registrant," their
immediate family members, and five- percent shareholders.  *See* 17 C.F.R. §
229.404(a).

[27] Chesapeake is alleged to have had transactions with the some of
McClendon's lenders at other times (A-42, ¶ 49), but those transactions are not
alleged to have included McClendon or any other party related to Chesapeake.

[28] The same analysis applies to Plaintiff's claim that Accounting Standards
Codification No. 850 ("ASC 850"), which governs "Related Party Disclosures"
under GAAP, required disclosure of the details of McClendon's personal loans.

*Litig.*, 884 F. Supp. 2d 1243, 1259 (S.D. Fla. 2012) ("Because the CAC does not contain any factual allegations to establish that [the defendant corporation] was a party to the transaction, Plaintiff fails to establish that Defendants had a duty to disclose it under Item 404(a).").

Simply put, the <u>only</u> FWPP transactions that qualify as "related party" transactions under Item 404(a) and GAAP are those between McClendon (the "related party") and Chesapeake (the "registrant" or "reporting entity"), and Chesapeake indisputably disclosed those transactions.  A-44, ¶ 53.[29]

---

*See* A-42, ¶¶ 49-51; AB-41-42.  Like Item 404(a), ASC 850 requires a transaction involving the entity reporting financial results -- here, Chesapeake.  Indeed, the fact that the relationship between McClendon and his third-party FWPP lenders does not constitute a "related party" transaction is underscored by ASC 850, which says that "[e]xamples of related party transactions include those between" (i) "A parent and its subsidiaries," (ii) "Subsidiaries of a common parent," (iii) "Any entity and trust for the benefit of employees, such as pension and profit-sharing trusts that are managed by or under the trusteeship of the entity's management," (iv) "An entity and its principal owners, management, or members of their immediate families," and (v) "Affiliates."  <u>All</u> of these examples contemplate a transaction involving the reporting entity.

[29]  Plaintiff's alternative assertion that ASC 850 somehow required Chesapeake to disclose "[i]nformation [*i.e.,* the FWPP loan] about transactions with related parties [*i.e.,* the FWPP]" (AB-41) is proven wrong by the Complaint itself.  As quoted there (A-42, ¶ 50), the "information" ASC 850 requires to be disclosed about related party transactions is limited to "four elements": (1) the nature of the relationship, (2) a description of the transaction and its financial effects on the period, (3) the dollar amount, as compared to prior periods, and (4) amount due to and from the related parties.  In other words, there is no requirement that a registrant must disclose the source of financing for a related-party transition.  That makes perfect sense because the purpose of related-party disclosure requirements relates to the fairness and subsequent performance of the <u>terms</u> of the related party <u>transaction itself</u>, not other information.

d.        CHESAPEAKE WAS UNDER NO DUTY TO DISCLOSE
DETAILS REGARDING MCCLENDON'S PERSONAL LOANS
WITH THIRD PARTIES

At bottom, Chesapeake was not required to disclose the fact that McClendon

used his FWPP holdings as collateral in financing transactions with third parties

(or details relating to those transactions) because they are "his <u>personal</u> assets . . .

<u>separate</u> and <u>distinct</u> from the Company's interest[s]."  SA-99-100, 109 (emphasis

added).   Under settled law, a company has no duty to disclose information

regarding its executives' personal financial dealings with third parties when the

company's assets are not implicated and is not a party to those transactions.  *See,*

*e.g.*, *City of Omaha v. CBS Corp.*, 2011 WL 2119734, at *8 (S.D.N.Y. May 24,

2011) (no duty to disclose chairman's personal loan that was made by third parties

because the loan "did not give the lenders recourse to [company] assets"), *aff'd*,

679 F.3d 64 (2d Cir. 2012); *In re Safeguard Scientifics*, 2004 WL 2700291, at *2

(E.D. Pa. Nov. 18, 2004) (holding there was no duty to disclose "information

regarding [CEO's] . . . financial liabilities"); *Burekovitch v. Hertz*, 2001 WL

984942, at *9-10 (E.D.N.Y. July 24, 2001) (no duty to disclose controller's

"personal trading practices" and "decision to commit large quantities of his stock

as security in margin trading").[30]

---

[30] *See also In re Donald Trump Casino Sec. Litig.*, 793 F. Supp. 543, 564-65
(D.N.J. 1992), *aff'd*, 7 F.3d 357 (3d Cir. 1993); *Beam ex rel. Martha Stewart*

Moreover, given what Chesapeake <u>did</u> disclose throughout the class period -
- *i.e.*, (1) that the "FWPP does not restrict [Mr. McClendon's] sales, other
dispositions or financing transactions involving FWPP interests,"[31] and (2) that
McClendon had in fact engaged in "personal financing transactions . . . with
respect to certain of his interests in the Company's wells"[32] -- the "omission" of the
details regarding McClendon's personal loans did not "alter[] the meaning" of any
of its statements regarding the FWPP.  *McDonald v. Kinder-Morgan, Inc.,* 287
F.3d 992, 998 (10th Cir. 2002) (absent rule requiring disclosure, "a duty to disclose
arises only where both the statement made is material, and the omitted fact is
material to that statement <u>in that it alters the meaning of the statement</u>" (emphasis
added)).   That is why the Complaint itself recites the fact that "investors <u>have</u>
<u>known for years</u> that McClendon has borrowed against or sold portions of his
[FWPP] stakes."  A-155 (emphasis added).

### 2.    THE COMPLAINT'S ATTEMPT TO ALLEGE A MATERIAL MISSTATEMENT REGARDING THE VPPS IS REFUTED BY THE DOCUMENTS IT CITES

The Complaint's allegations that Chesapeake misstated its VPPs (A-50-82,
¶¶ 72-159) are similarly refuted by documents cited in the pleading and properly

---

*Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 971 (Del. Ch. 2003), *aff'd*, 845
A.2d 1040 (Del.  2004).

[31] SA-86, 99-100, 109.

[32] SA-82, 86-87, 94, 99-100, 109.

before the Court on the Motion to Dismiss. The mantra that VPPs are secretive transactions that conceal "liabilities" and "debt" is directly refuted by Chesapeake's voluminous VPP disclosures and by Plaintiff itself. As noted above, Plaintiff admitted that VPPs "do not constitute debt and thus do not create any debt or liability to place the balance sheet." A-186 (emphasis added).

Plaintiff's prior acknowledgment of the fact that the VPPs do not involve "debt" or create "liabilities" makes a mockery of their current assertions to the contrary, and of their attempt to convert the GAAP-mandated accounting into an accounting or disclosure violation. The analysis could end there, but there is more. Chesapeake also disclosed the date of each VPP transaction, the region, the dollar amount of the proceeds received (reflected on the balance), the volume of proved reserves to be delivered (subtracted from proven reserves on the balance sheet), the period over which such volumes were to be produced, and the self-evident fact that Chesapeake bore the cost of the production costs associated with the VPP. *See, e.g.*, SA-121-122, 125, 134-135, 138, 147-148, 151.

Plaintiff's attempt to manufacture a "duty" to further disclose the amount of production costs specifically attributable to VPPs is contradicted by the controlling GAAP and SEC guidance, and by common sense. The costs of producing the oil and gas covered by VPP transactions would necessarily be borne by Chesapeake as the seller. Because Chesapeake disclosed the exact volume of the oil and gas being

sold, and the precise period in which it would be delivered, investors were specifically advised of the nature, size and timing of each VPP commitment. Moreover, the projected costs associated with producing the oil and gas being delivered pursuant to the VPPs were included in the Company's financial statements and included in the Company's future guidance, along with all costs associated with producing the rest of the oil and gas.[33]  Investors thus had complete information regarding all such costs.  <u>Nothing</u> was "hidden," much less "debt" or "liabilities."[34]

Plaintiff's invocation of Section 401(a) of the Sarbanes-Oxley Act ("SOX") and Item 303(a) of Regulation S-K (A-50-52, ¶¶ 72-75; AB-37-39) further underscores the lack of merit in its position.  Item 303(a), the implementing rule

---

[33] *See, e.g.*, SA-209 (noting that updated guidance "includes estimated production decreases . . . associated with potential . . .VPP and other monetization transactions"); SA-166 (updating forecast based in part on new VPP); SA-172 (noting that "guidance has been updated to reflect . . . anticipated [VPP] transactions in 2009 and in 2010"); SA-179 (same); SA-186 (updating forecast based on updated "asset monetization projections" and cost assumptions); SA-194 (noting that updated guidance has incorporated "the anticipated closing of VPP #9," "increased drilling and completion costs" and updated "[c]ost assumptions").

[34] Plaintiff claims that a Chesapeake spokesman, "acknowledged to the press . . . that the Company had not purposely disclosed its VPP liabilities."  AB-26 n.6. Putting aside the fact that Chesapeake has no VPP "liabilities," only future production costs associated with the delivery of oil or gas to its VPP counterparties, the spokesman said no such thing.  Rather, he stated that while future VPP production costs were not "specifically broken out, the company reflected th[ose] [costs] in its guidance on future operating costs."  A-161.

for Section 401(a), is confined to a <u>specific</u> definition of "off-balance sheet arrangements" that simply has <u>no</u> application here.[35]

It is no accident that Plaintiff cannot cite any relevant GAAP or SEC provision that supports its unprecedented position. There is no requirement that VPP costs be disaggregated from other production costs, or to report future production costs by type. The "failure" to adopt that format so did not "alter[] the meaning" of any statement regarding the VPPs. *McDonald*, 287 F.3d at 998. Nor did it impact -- much less conceal -- the production costs as a whole, which, again, do not constitute debt or liabilities in any event.

As shown above, Chesapeake accounted for and disclosed the VPPs in accordance with Rule 4-10 of Regulation S-X (*see, e.g.*, SA-138), and followed the guidance given in its outside auditor's (PwC) publication, "Petroleum Accounting – Principles, Procedures & Issues." *See* SA-224. There is no legal duty to do

---

[35] Item 303(a) defines an "off-balance sheet arrangement" as any transaction with an unconsolidated entity, under which the reporting company has: (1) any obligation under certain guarantee arrangements as identified in FASB ASC paragraph 460-10-15-4 (*e.g.*, guarantees of the indebtedness of others, indemnification agreements); (2) a retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to the entity; (3) any obligation under a derivative instrument that is both indexed to the company's own stock and classified as stockholders' equity in the balance sheet; or (4) any obligation arising out of a material variable interest held by the company in an unconsolidated entity that provides financing, liquidity, market or credit risk support to, or engages in leasing, hedging or research and development services with, the company. 17 C.F.R. § 229.303(a)(4)(ii)(A)-(D). VPP transactions do not fall into <u>any</u> of those categories.

anything <u>other than</u> that, and no colorable basis for concluding that any of the VPP

statements or "omissions" is actionable under Section 10(b).

Under Tenth Circuit law, PwC's repeated issuance of unqualified audit

opinions[36] on the financial reporting Plaintiff claims was fraudulent, and the

absence of a restatement or any suggestion that a restatement was required, erect

yet another barrier to Plaintiff's attempt to plead that Chesapeake "concealed"

"debt" or "liabilities" via its VPPs.[37]  *See, e.g.*, *Slater v. A.G. Edwards & Sons,*

*Inc.*, -- F.3d --, 2013 WL 3390038, at *14 (10th Cir. July 9, 2013) (fact "that

KPMG approved Thornburg's 2006 financials" along "with Thornburg's decision

not to restate its 2006 financials, conclusively defeat[s] any claim" of falsity).

Numerous other courts have reached the same conclusion for the same reasons.[38]

---

[36] *See* SA-118, 131, 144.

[37] Moreover, as discussed above, the claim that the VPPs "actually increased corporate liabilities" (AB-2, 12) is also refuted by the judicially-noticeable fact that the Company "has sold approximately 1.37 trillion cubic feet of natural gas equivalent (tcfe) of proved reserves [via VPPs] for combined proceeds of approximately $6.4 billion, or approximately $4.65 per mcfe, which is approximately <u>300% more</u> than the company's current drilling and completion cost per mcfe." SA-204 (emphasis added).

[38] *See, e.g.*, *In re 2007 Novastar Fin. Inc. Sec. Litig.*, 2008 WL 2354367, at *3 (W.D. Mo. June 4, 2008), *aff'd*, 579 F.3d 878 (8th Cir. 2009); *In re Levi Straus & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 987-88 (N.D. Cal. 2007); *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 588 (E.D. Va. 2006); *Indiana State Dist. Council of Laborers and HOD Carriers Pension and Welfare Fund v. Omnicare, Inc.*, -- F.3d --, 2013 WL 2248970, at *10 (6th Cir. May 23, 2013); *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 973 (S.D. Ohio 2009); *Payne v. DeLuca*, 433 F. Supp. 2d 547, 580 (W.D.

**D.**          <span>THE COMPLAINT FAILED TO PLEAD SCIENTER</span>

Even if the Complaint <u>had</u> pled falsity via clear violations of numerous GAAP and SEC requirements, and a restatement had occurred as a result, Plaintiff would be a long way from being able to plead scienter in conformance with controlling law.  In such a situation, which would bear no resemblance to the one at issue here, Plaintiff would have to start by satisfying the Reform Act's particularity requirements, including by marshalling particularized allegations that the misstatements were made with fraudulent intent.

The Complaint would also have to show, irrespective of particularity, that when examined in context, the particularized allegations rise to a cogent and compelling inference of fraud.  As demonstrated below, that would not be possible in this case.

Financial, accounting and disclosure defects are actionable only when they are "the result of the defendant's fraudulent intent to mislead investors." *Fleming*, 264 F.3d at 1261.  Complaints are frequently dismissed for failure to allege scienter even when there has been a massive restatement, because the existence of false statements is not actionable under Section 10(b) absent compelling allegations of fraudulent intent.

---

Pa. 2006); *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 894 (W.D.N.C. 2001); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010).

As the District Court correctly determined, there are no such allegations in the Complaint. Worse still, the factors that are routinely pled as supporting a strong inference of fraud -- *e.g.*, a stock offering, stock merger or large stock sales by the senior managers alleged to have perpetrated securities fraud -- are <u>also</u> conspicuously absent. That void makes it impossible to allege an intention to deceive, manipulate or defraud under <u>all</u> of the facts, taken collectively, as required by the Supreme Court.

### 1.   THE COMPLAINT IS DEVOID OF ANY PARTICULARIZED FACTS SUPPORTING A "STRONG INFERENCE" OF SCIENTER, AS REQUIRED BY THE REFORM ACT

The Reform Act obligated Plaintiff to "state with <u>particularity facts</u> giving rise to a strong inference that [each] defendant acted with the required statement of mind for each alleged securities law violation." *Caprin v. Transp. Servs., Inc.*, 99 F. App'x 150, 159 (10th Cir. 2006) (quotations omitted). As the District Court recognized, Plaintiff's Complaint fell <u>far</u> short of satisfying this requirement:

> [T]he Complaint <u>is devoid of any particularized factual allegations</u> that would give rise to a strong inference that any defendant acted with an intent to deceive, manipulate or defraud, or recklessness, and instead plaintiffs <u>group all defendants together and make generalized, conclusory allegations regarding scienter without any specific corroborating details</u> . . . that would tend to show that the particular defendant knew the "truth" about the facts that were purportedly misstated and knew that its non-disclosure would likely mislead investors.

ADD-6 (emphasis added).

Plaintiff does not seriously dispute the complete absence of "specific corroborating details" giving rise to a strong inference of fraudulent intent as to each Defendant.[39]  Indeed, the Complaint is cobbled together from a mish-mash of out-of-context quotes and speculation culled from media articles that criticize Chesapeake and McClendon on various purported grounds, but contain no suggestion that anyone engaged in securities fraud.

In any event, "[i]t is not enough to quote press speculation about defendants' motives and press reports."  *Stern*, 844 F.2d at 1004.  A "complaint must rise or fall on allegations about defendants' conduct, and not on wide-eyed citation to the gratuitous commentary of outsiders."  *Hershfang*, 767 F. Supp. at 1255 (emphasis added); *see also Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010) ("news articles cited [] must indicate particularized facts about a defendant's conduct in order to support [the] claims.'").

Nor can Plaintiff challenge the legal conclusions that the District Court drew from the Complaint's dearth of "specific corroborating details" of fraudulent intent on the part of any Defendant.   "[O]missions and ambiguities count against inferring scienter," *Tellabs*, 551 U.S. at 326, and "[g]eneralized imputations of

---

[39] Instead, they argue that the "obvious" "materiality" of the allegedly "concealed" facts, alone, establishes scienter.  AB-27-35.  As explained below, this argument is both legally and factually unfounded.

knowledge do not suffice, regardless of defendants' positions within the company," *Fleming*, 264 F.3d at 1264 (quotations omitted).

Moreover, the Reform Act "requires the plaintiff to establish a culpable state of mind on the part of <u>each</u> defendant <u>individually</u>." *In re NutriSystem, Inc. Sec. Litig.*, 653 F. Supp. 2d 563, 575 (E.D. Pa. 2009) (emphasis added); *see, e.g.*, *W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, 2008 WL 879023, at *14 (D. Colo. Mar. 28, 2008) .   As the District Court noted, the Complaint fails on that ground as well.

### 2.    THE EXISTENCE OF UNQUALIFIED AUDIT OPINIONS AND ABSENCE OF A RESTATEMENT FURTHER REFUTE ANY INFERENCE OF SCIENTER

As this Court has recently reiterated, "it is well-established that '[c]laims of accounting irregularities or violations of [GAAP] support a claim of scienter only when coupled with evidence that the violations or irregularities are the result of the defendant's fraudulent intent to mislead investors." *Dronsejko*, 632 F.3d at 669 (alterations in original).  No such allegations appear in the Complaint.

Moreover, the fact that Chesapeake has not restated the financial statements and related filings challenged in the Complaint -- and no one has suggested it do so -- <u>further</u> undercuts any claim of scienter.  *See, e.g.*, *In re JP Morgan Chase Sec. Litig.*, 2007 WL 950132, at *13 (S.D.N.Y. Mar. 29, 2007) (fact that complaint did not plead that "JPM Chase has had to restate its financial statements due to failure

to comply with [ASC 850]" supports "an inference that defeats plaintiffs' claim of recklessness"), *aff'd*, 553 F.3d 187 (2d Cir. 2009); *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *18 (S.D.N.Y. Sept. 28, 2012) ("the fact that UBS's outside independent auditor . . . did not require a restatement . . . significantly undercuts Plaintiffs' allegations of recklessness"); *Fannie Mae*, 742 F. Supp. 2d at 408 (fact that "only the Plaintiffs contend that Fannie committed these GAAP violations" and "federal regulators . . . ha[ve] not asked for a restatement of any of its financials" defeated any inference of scienter); *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535-36 (5th Cir. 2007) (complaint failed to allege scienter where "unlike most securities fraud cases" there "was no mea culpa from the company in the form of acknowledged wrongdoing or restated financial reports, nor was there any auditor qualification to those aspects of the reports made the basis of this complaint, nor any publicly expressed reservations by the auditors to the financials").[40]

---

[40] *See also Zucco Partners LLC v. Digimarc Corp.*, 552 F.3d 981, 998 n.5 (9th Cir. 2009); *Huntington Bancshares*, 674 F. Supp. 2d at 973; *Cole v. Health Mgmt. Assoc., Inc.*, 2009 WL 2713178, at *10 (M.D. Fla. July 17, 2009); *Hilb Rogal & Hobbs*, 432 F. Supp. 2d at 588; *2007 Novastar*, 2008 WL 2354367, at *3; *Lapiner v. Camtek, Ltd.*, 2011 WL 445849, at *8 (N.D. Cal. Feb. 2, 2011); *Jiangbo*, 884 F. Supp. 2d at 1263; *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 854 (N.D. Tex. 2005); *Head v. NetManage, Inc.*, 1998 WL 917794, at *6 (N.D. Cal. Dec. 30, 1998); *In re Credit Acceptance Corp. Sec. Litig.*, 50 F. Supp. 2d 662, 680 (E.D. Mich. 1999); *In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1358-59 (N.D. Ga. 2010); *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d

Under equally abundant authority, the fact that Chesapeake's auditors repeatedly issued unqualified audit opinions on the Company's financial reports[41] is also "'highly probative' of an absence of scienter." *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) (citing *In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 669 (3d Cir. 2002)).[42]     Put simply, "if [Chesapeake's] financial statements were knowingly false, then [its] auditors must have either been complicit, kept in the dark, or negligent. . . .  Plaintiff[] make no such allegations.   Such a glaring *non sequitur* undermines any inference of scienter." *Proter v. Medifast, Inc.*, 2013 WL 1316034, at *15 (D. Md. Mar. 28, 2013).

### 3.     THE COMPLAINT WAS PROPERLY DISMISSED BECAUSE THE FACTS PROPERLY BEFORE THE COURT PRECLUDED A STRONG INFERENCE OF FRAUDULENT INTENT

Plaintiff's statement that the District Court based its scienter ruling on the absence of "smoking gun" evidence of fraudulent intent (AB-5) cannot be

---

1307, 1323 (S.D. Fla. 2004); *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1291 (S.D. Fla. 2008).

[41] *See* SA-118, 131, 144.

[42] *See, e.g.*, *Shaw*, 537 F.3d at 535-36; *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 348 n.63 (D.N.J. 2007); *Druskin*, 299 F. Supp. 2d at 1324 n.25; *In re REMEC, Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1246 (S.D. Cal. 2010); *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1465 (N.D. Cal. 1996); *Alamosa*, 382 F. Supp. 2d at 854; *Hubbard*, 625 F. Supp. 2d at 1291; *In re Wet Seal Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1166 (C.D. Cal. 2007); *Huntington Bancshares*, 674 F. Supp. 2d at 973.

reconciled with the opinion it mischaracterizes. As a cursory review shows, the District Court did exactly what Plaintiff claims it failed to do. Among other things, the Court "assessed plaintiffs' allegations <u>holistically</u>" as "directed by *Tellabs*," and held that, "taken <u>collectively</u>, these allegations do not give rise to a 'cogent and compelling' inference that defendants intentionally or recklessly concealed that the VPPs obligated Chesapeake to incur significant future productions costs . . . or that defendants intentionally or recklessly concealed the loans McClendon took out to finance his participation in the FWPP." ADD-6 (emphasis added).

A "strong inference" of scienter is one that is "powerful," "cogent" and "at least as compelling" as any innocent inference. *Tellabs*, 551 U.S. at 323-24. For multiple reasons, Plaintiff cannot plead facts giving rise to such an inference here. Plaintiff instead seeks to circumvent the Reform Act's requirements entirely by invoking the so-called "core operations" doctrine -- the idea that facts concerning a company's core business will be imputed to corporate officers. AB-35-36; A-90-92, ¶¶ 170-83. That effort fails on multiple grounds.

It is not merely "questionable whether the 'core operations' doctrine has survived the PSLRA," *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 593 n.17 (S.D.N.Y. 2011), or that it "has not been recognized in this circuit," *Wolfe v. Aspenbio Pharma., Inc.*, 2012 WL 4040344, at *9 (D. Colo. Sept. 13, 2012). The notion that scienter can be pled by virtue of the fact that defendants held senior

positions and therefore "must have" been aware of a purported securities violations collides head-on with the Reform Act[43] and Tenth Circuit law.[44]

Moreover, the relevant question whether a defendant was aware of the information that purportedly was "concealed," as Plaintiff suggests.  AB-5.  Of course McClendon knew about his FWPP loans -- they are his personal loans.  Likewise, Chesapeake knew that it bears the production costs associated with its VPPs -- they are the Company's own contracts.

As this Court has emphasized, knowledge of material facts is irrelevant absent a demonstration that information was withheld "in order to deceive, manipulate or defraud":

> allegations that the defendant possessed knowledge of facts that are later determined by a court to have been material, without more, is not sufficient to demonstrate that the defendant intentionally withheld those facts from or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate or defraud.

*Fleming*, 264 F.3d at 1260 (emphasis added).

---

[43] "[T]he plain language of the PSLRA, which requires facts supporting the scienter inference to be 'state[d] with particularity,' would seem to limit the force of general allegations about the core company operations."  *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011).

[44] *See, e.g., Fleming*, 264 F.3d at 1264; *Prissert v. EMCORE Corp.*, 894 F. Supp. 2d 1361, 1373 (D.N.M. 2012) ("Plaintiffs' conclusory allegations that Defendants were 'top executive officers' charged with important responsibilities fall short of the PSLRA standards.").

Accordingly, Plaintiff must show that a defendant had -- and knew he had -- a "clear duty" to disclose the information and disregarded that duty in order to deceive, manipulate and defraud.  *See id.* at 1261.  As demonstrated above, and further explained below, Plaintiff cannot even allege the requisite "clear duty," much less specific facts demonstrating Defendants' knowledge of such a duty and an intention to deceive, manipulate or defraud.

### 4.    THE ABSENCE OF A "CLEAR" OR "OBVIOUS" DUTY TO DISCLOSE DEFEATS ANY INFERENCE OF SCIENTER

Recognizing that the Complaint is devoid of any particularized allegations supporting a strong inference that any Defendant acted with fraudulent intent, Plaintiff resorts to arguing that the information Defendants supposedly "concealed" was "so obviously material" that, under *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011), its nondisclosure alone establishes their culpable state of mind. *See* AB-27-35.  That argument fails on multiple grounds, including the fact that *Matrixx* was a very different case, and Plaintiff's erroneous assumption that the possession of material information automatically imposes a duty to disclose it.[45]

---

[45]  It also erroneously assumes that knowledge of material information equates to scienter.  It does not.  As one court explained:

> To the extent that Plaintiffs argues that a strong inference of fraud *must* be drawn from the mere fact of a material omission, it ignores the fact that scienter -- intent to defraud or recklessness -- is an essential element of plaintiff's Rule 10b–5 cause of action. . . .  It would be folly to hold . . . that the knowing failure to disclose a material fact in and of itself necessarily gives rise to a strong inference of fraud. There are far too

Needless to say, "duty to disclose and materiality are distinct elements of any claim of securities fraud, and must not be equated." *Backman v. Polaroid Corp.*, 893 F.3d 1405, 1411 (1st Cir. 1990).

Indeed, in *Matrixx* the Supreme Court specifically reaffirmed and emphasized the long-standing rule that the possession of material, non-public information does not create an automatic duty to disclose. 131 S. Ct. at 1321-22.

In certain circumstances not present here, it is conceivable that the non-disclosure of important facts coupled with defendant's knowledge that they were "so obviously material" that the defendant "must have been aware both [1] of its materiality and [2] that its non-disclosure would likely mislead investors" (AB-25-26), might plead scienter. The latter prong, however -- "that its non-disclosure would likely mislead investors" -- would still presuppose the existence of a duty to disclose, since "[s]ilence, absent a duty... is not misleading under Rule 10b-5." *Basic*, 485 U.S. at 239 n.17 (emphasis added).

A "failure to disclose certain information is not actionable unless [the defendant] intended to defraud or mislead by withholding information that it knew

---

many circumstances in which a material omission would evidence no such mental state. The person or entity responsible might have held a perfectly reasonable and good faith, if ultimately mistaken, belief that the fact omitted was not material, to name but one.

*L.L. Capital Partners, L.P. v. Rockefeller Ctr. Props., Inc.*, 939 F. Supp. 294, 299 (S.D.N.Y. 1996) (italics in original).

it had a <u>clear</u> duty to disclose."[46]  *First N.Y. Sec. LLC v. United Rentals Inc.*, 391 F. App'x 71, 73 (2d Cir. 2010) (last emphasis added).[47]  That elemental point was clearly articulated by this Court as the basis of its ruling in *Fleming*.  *See* 264 F.3d at 1260-1261.

As demonstrated above, the Complaint's allegations do not come close to establishing that Chesapeake had an "obvious" or "clear" duty to disclose information regarding McClendon's <u>personal</u> loans with third-party lenders, or to disaggregate VPP production costs from other operating expenses (which is what Plaintiff's VPP claim boils down to).  Moreover, as noted above, even if a clear duty existed (it didn't) and assuming that Defendants were aware of it (they couldn't have been), Plaintiff would still need to plead particularized facts supporting a strong inference of an intent to deceive, manipulate or defraud, which they cannot do.

Plaintiff cannot point to any rule or other authority requiring disclosure of McClendon's personal transactions with third parties -- Items 403(b) and 404(a),

---

[46] "The requirement that the duty be 'obvious' ensures that fraudulent intent will not be imputed to a [defendant] every time a public statement lacks detail." *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 276 (S.D.N.Y. 2012) (citation omitted).

[47] "[I]f the complaint 'does not present facts indicating a clear duty to disclose' . . . [a] 'plaintiff's scienter allegations do not provide strong evidence of conscious misbehavior or recklessness.'"  *In re Centerline Holding Co. Sec. Litig.*, 380 F. App'x 91, 93 (2d Cir. 2010) (quoting *Kalnit*, 264 F.3d at 144).

and ASC 850 simply have no application to such transactions.  *See, e.g.*, *Richman*, 868 F. Supp. 2d at 276 ("Regulation S–K, Item 103 and FINRA and NASD Rules do not create an obvious duty to disclose . . . .  Since the duty to disclose . . . was not so clear, Defendants' 'recklessness' cannot be inferred from the failure to disclose." (quotations omitted)).  Likewise, there is <u>zero</u> authority requiring a company to breakdown its operational expenses by type when reporting its financial results.

The fact that Chesapeake's independent auditors repeatedly issued unqualified opinions, and no one has ever suggested that the Company should restate its financials further confirms both the absence of an "obvious" or "clear" duty to disclose, and that there is no possibility that Defendants acted with an intent to deceive, manipulate or defraud.

Moreover, given what Chesapeake <u>did</u> disclose throughout the class period, Plaintiff cannot possibly claim an "obvious" duty to disclose the allegedly "concealed" information.  As explained above, Chesapeake repeatedly disclosed that the FWPP does not restrict McClendon's sales, other dispositions or financing transactions involving FWPP interests, and that McClendon sold FWPP interests in conjunction with sales by the Company and made personal financing transactions with respect to his FWPP well interests.  Likewise, Chesapeake repeatedly disclosed that it bears the production costs associated with VPPs, and as its SEC

filings make clear, those production costs were reported in the Company's financial statements as they were incurred and were projected into guidance, along with all of the Company's other production costs.

These facts stand in stark contrast to the conduct at issue in *Matrixx*.  In *Matrixx*, the plaintiffs alleged that Matrixx and its top executives failed to disclose reports of a possible link between its leading product, Zicam, a cold remedy, and loss of smell, rendering statements made by Matrixx misleading.  131 S. Ct. at 1313.  The plaintiffs alleged particularized facts demonstrating that the defendants had specific, objective facts in the form of existing data from outside experts that placed in question the safety of Zicam.  *Id.* at 1315-16.  Despite this knowledge, the defendants took <u>affirmative</u> steps to discredit information that they apparently knew was correct, including by issuing press releases that characterized the data as "completely unfounded and misleading," and stating that the safety of its product was "well established."  The company also advised the market "that studies had confirmed that [its product] does not cause anosmia when, in fact, it had not conducted any studies relating to anosmia and the scientific evidence at that time, according to the panel of scientists [the company <u>itself</u> convened], was insufficient to determine whether Zicam did or did not cause anosmia."  *Id.* at 1323-24.

It is against this backdrop -- *i.e.*, the company concealed, and then publicly <u>discredited</u> expert opinions, despite knowing that it had no basis to doubt the

accuracy of those opinions -- that the Supreme Court held that the plaintiffs adequately alleged a strong inference of scienter.  The Supreme Court did not hold, as Plaintiff suggests (AB-27-35), that the failure to disclose material information alone supports a strong inference of scienter.  *See Matrixx*, 131 S. Ct. at 1321 ("[I]t bears emphasis that § 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information.").

### 5. THE FACT THAT DEFENDANTS DRAMATICALLY INCREASED THEIR STOCK HOLDINGS, AND ARE NOT ALLEGED TO HAVE SOLD ANY SHARES, REFUTES ANY INFERENCE OF SCIENTER

The Complaint's inability to allege suspicious sales of Chesapeake stock during the alleged Class Period devastates any inference of fraud.  As the court in *Thornton v. Micrografx, Inc.,* 878 F. Supp. 931 (N.D. Tex. 1995), pointedly emphasized:  "Why would the Defendants expend so much time and effort to conceal facts and misrepresent information . . . [without] enjoying the fruits of their fraud by selling their stock?"  *Id.* at 938; *see also Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1253 (11th Cir. 2008) ("the lack of [stock] sales weighs against inferring scienter").

A multitude of cases dismissing Section 10(b) claims have underscored the point that securities fraud claims make little sense when the insiders fail to sell substantial amounts of stock at the prices Plaintiff alleges were inflated by their fraud.  *See, e.g.*, *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 290 n.182

(S.D.N.Y. 2006) ("[D]ozens of cases dismiss[] complaints on scienter grounds where . . . stock sales were found to be *de minimis* or [where] motive allegations were undermined by increases in total holdings."); *Andropolis v. Red Robin Gourmet Restaurants, Inc.*, 505 F. Supp. 2d 678 (D. Colo. 2007) ("[T]he inference of scienter in this case is particularly weak given that Plaintiff does not allege inside stock sales"); *In re United Telecom. Sec. Litig.*, 781 F. Supp. 696, 702-03 (D. Kan. 1991) (conclusion that complaint failed to plead scienter was "especially compelling in the absence of any allegations of insider trading.").[48]

In this case, the insiders dramatically <u>increased</u> their stock holdings,[49] rather than bailing out of the stock or seeking to profit from a purported fraud, which is "a fact wholly inconsistent with fraudulent intent." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004). Plaintiff "cannot present 'strong circumstantial evidence of conscious misbehavior or recklessness' where . . . Defendants . . . increased their holdings." *In re MRU Holdings Sec. Litig.*, 769 F.

---

[48] *See also Druskin*, 299 F. Supp. 2d at 1336 n.40; *In re FVC.com Sec. Litig.*, 136 F. Supp. 2d 1031, 1039 (N.D. Cal. 2000), *aff'd*, 32 F. App'x 338 (9th Cir. 2002); *Sun Healthcare,* 181 F. Supp. 2d at 1296; *Circuit City*, 286 F. Supp. 2d at 716; *Brogren v. Pohlad,* 933 F. Supp. 793, 799 (D. Minn. 1995); *Oppenheimer v. Novell*, 851 F. Supp. 412, 418 (D. Utah 1994); *Stamatio v. Hurco Cos.,* 885 F. Supp. 1180, 1184 (S.D. Ind. 1995); *In re PetSmart, Inc., Sec. Litig.*, 61 F. Supp. 2d 982, 1000 (D. Ariz. 1999).

[49] As discussed above, during the class period, McClendon's holdings increased by <u>48.95%</u>, Mr. Dell'Osso's holdings increased by <u>277.34%</u>, and Mr. Hood's holdings increased by <u>61.46%</u>.

Supp. 2d 500, 515 (S.D.N.Y. 2012); *see, e.g.*, *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 572-73 (E.D. Pa. 2009) ("Defendants . . . actually increased their holdings incrementally throughout the Class Period.  Such conduct raises a compelling inference *against* scienter." (emphasis in original)).

Messrs. McClendon and Dell'Osso, who according to Plaintiff's accusations would have directed and been actively involved in the alleged wrongdoing, together purchased nearly two million dollars of Chesapeake stock on the open market during the alleged class period.  SA-7-8, 11-12, 15-16, 19-20, 32-33, 36-37.

That fact further refutes any inference of an intent to deceive, manipulate or defraud.  "[A]ny finding of a strong circumstantial evidence of conscious misbehavior or recklessness is negated by [their] purchase, and holding, of [Chesapeake] shares throughout the class period."  *In re MELA Sciences, Inc. Sec. Litig.*, 2012 WL 4466604, at *6 (S.D.N.Y. Sept. 19, 2012); *see, e.g.*, *Hilb Rogal & Hobbs*, 432 F. Supp. 2d at 594 ("The fact that a defendant acquires stock during a class period further negates any idea that Defendants had a motive to commit fraud."); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 152 (D. Conn. 2007) (fact that CFO increased his total holdings and purchased shares in the open market was "wholly inconsistent with fraudulent intent").

*Tellabs* instructs courts to consider all potential inferences, and the fact that the Individual Defendants are not alleged to have sold their stock at the allegedly

inflated prices and, in fact, dramatically increased their collective holdings to more than 4.3 million shares, "meant that they stood to lose a lot of money if the value of [Chesapeake's] stock fell." *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008) (affirming dismissal on scienter grounds).  To find scienter under these circumstances, therefore, would be to assume that the Individual Defendants intentionally defrauded investors to their own ultimate detriment.  Courts, including this one, reject such an inference that makes little economic sense. *See, e.g.*, *McNamara v. Pre-Paid Legal Servs., Inc.*, 189 F. App'x 702, 717-18 (10th Cir. 2006) (affirming dismissal on scienter grounds since complaint was "lacking in allegations demonstrating [] Defendants' alleged fraud was economically logical" in light of stock purchases "at allegedly inflated prices"); *In re Digital Island Sec. Litig.*, 357 F.3d 322, 331 (3d Cir. 2004) (affirming dismissal on scienter grounds; "'plaintiffs' theory makes little economic sense because the directors' own stock options would have been devalued"); *see also Kalnit*, 264 F.3d at 140-41 ("Where plaintiff's view of the facts defies economic reason . . . [it] does not yield a reasonable inference of fraudulent intent." (quotations omitted)).

**6.     THE COMPLAINT'S OTHER BOILERPLATE SCIENTER ALLEGATIONS ADD NOTHING TO THE ANALYSIS AND ARE CONTRADICTED BY THE DOCUMENTS IT CITES IN ANY EVENT**

The Complaint also attempts to plead scienter with the "motive and opportunity" allegation that McClendon "had a financial motive to conceal both

the magnitude" of his personal FWPP loans "and the manner in which he was participating in the FWPP to ensure the continuation of this personally lucrative program." *See* AB-43-44.

Putting aside the fact that Chesapeake repeatedly disclosed that McClendon made personal financing transactions with respect to his FWPP interests, and far from being "personally lucrative," McClendon has had <u>negative cash flows</u> resulting from the FWPP since the inception of the program,[50] it is well-established that "to allege a motive sufficient to support" an inference of fraudulent intent, "a Plaintiff must do more than merely charge that executives aim to prolong the benefits . . . they hold." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994); *accord Fleming*, 264 F.3d at 1270.

The notion that McClendon needed to "conceal" his FWPP loans in order to "ensure the continuation" of the FWPP is further contradicted by the fact that he was <u>contractually entitled</u> to participate in the FWPP through 2015, and to mortgage or sell his well interests as he sees fit. SA-159. Those contractual rights were never threatened, because neither Chesapeake nor its shareholders had the power to unilaterally "discontinue" them.[51]

---

[50] *See* SA-159.

[51] The claim that the Company terminated the program before its expiration (AB-43) is false. The Company renegotiated the duration of the FWPP (from December 2015 to December 2014) only <u>with Mr. McClendon's consent</u>. *See* Chesapeake Energy Form DEF 14A, filed May 11, 2012 ("The Board and

Plaintiff's attempt to use the fact that Messrs. McClendon, Rowland and Dell'Osso executed SOX certifications as support for an inference of scienter (AB-39-40) is baseless.  "[R]equired certifications under Sarbanes-Oxley . . . add nothing substantial to the scienter calculus" and "do not make [a plaintiff's] otherwise insufficient allegations more compelling by their presence in the same complaint."  *Zucco*, 552 F.3d at 1003-09.  This is because allowing mandatory SOX certifications to create an inference of scienter "in every case where there was an [alleged] accounting error or auditing mistake [made] by a publicly traded company" would "eviscerat[e] the pleading requirements for scienter set forth in the PSLRA."  *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248 (8th Cir. 2008) (quotations omitted); *accord Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 555 (5th Cir. 2007); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006).  Even if the law were otherwise, execution of certifications in this case would be unavailing because, as demonstrated above, there was nothing wrong with the underlying financial reporting.

Finally, to the extent Plaintiff is claiming that the existence of the SEC's investigation into the FWPP -- which notably has not resulted in any charges against any Defendants -- supports an inference of scienter (AB-7, 21; A-29, ¶ 8; A-59, ¶ 102), it is well-established that "[t]he mere existence of an SEC

[McClendon] voluntarily renegotiated the terms of the FWPP to provide for early termination on June 30, 2014 . . . .").

investigation does not suggest that any of the allegedly false statements were actually false . . . [,] nor does it add an inference of scienter." *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 962 (8th Cir. 2008); *see, e.g.*, *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 628 n.2 (4th Cir. 2008) ("Plaintiffs allege that the SEC is investigating Inspire and Shaffer for fraud, but that assertion is too speculative to add much, if anything, to an inference of scienter.").[52]

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be affirmed.

Respectfully submitted.

Dated:  July 17, 2013

By:  _____*/s/ Spencer F. Smith*_____
                SPENCER F. SMITH

Robert P. Varian (Admitted Pro Hac Vice)
Kenneth P. Herzinger (Admitted Pro Hac Vice)
M. Todd Scott (Admitted Pro Hac Vice)
Alexander K. Talarides (Admitted Pro Hac Vice)
**Orrick, Herrington & Sutcliffe LLP**
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
Facsimile:  (415) 773-5759
rvarian@orrick.com
kherzinger@orrick.com
tscott@orrick.com
atalarides@orrick.com

Spencer F. Smith, OBA #20430

---

[52] *See also Hansen*, 527 F. Supp. 2d at 1162 ("'[T]he mere existence of [an] investigation cannot support any inferences of wrongdoing or fraudulent scienter on the part of [a] company or its senior management.'").

McAfee & Taft A Professional Corporation
211 North Robinson, Suite 1000
Two Leadership Square, 10th Floor
Oklahoma City, OK  73102
Telephone.:  (405) 552-2246
Facsimile:     (405) 235-0439
spencer.smith@mcafeetaft.com

*Attorneys for Defendants-Appellees*

## <u>CERTIFICATE OF SERVICE AND E-SUBMISSION</u>

I hereby certify that on July 17, 2013, I electronically transmitted the attached document to the following counsel of record:

Sean Connelly          sconnelly@rplaw.com

Joseph A. Fonti          jfonti@labaton.com

Jonathan M. Plasse          jplasse@labaton.com

Javier Bleichmar          jbleichmar@labaton.com

Serena P. Hallowell          shallowell@labaton.com

Jeffrey R. Alexander          jalexander@labaton.com

    ☑    The undersigned certifies all required privacy redactions have been made, and with the exception of those redactions, the document submitted in Digital Form is an exact copy of the written document filed with the Clerk of this Court.

    ☑    The undersigned further certifies that the digital submissions have been scanned for viruses with McAfee VirusScan Enterprise 8.0.0, and, according to the program, are free of viruses.

                                             */s/ Spencer F. Smith*
                                           SPENCER F. SMITH

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[X]    this brief contains 13,971 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[ ]    this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)

2.    This brief complies with typeface requirements of Fed R. App. P. 32(a)(5) and the type style requirements of Fed R. App. P. 32(a)(6) because:

[X]    this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in 14 pt. Times New Roman font, or

[ ]    this brief has been prepared in a monospaced typeface using _____ with _____.

Dated this 17th day of July, 2013.


                                             */s/ Spencer F. Smith*
                                          SPENCER F. SMITH