**13-6121**

# United States Court of Appeals
## for the
# Tenth Circuit

DVORA WEINSTEIN; STEVEN WEINSTEIN, individually
and on behalf of all others similarly situated,

*Plaintiffs,*

– v. –

AUBREY K. McCLENDON; CHESAPEAKE ENERGY CORPORATION;
DOMENIC J. DELL'OSSO; MARCUS ROWLAND; MICHAEL A. JOHNSON;
JEFFREY L. MOBLEY; HENRY J. HOOD,

*Defendants-Appellees.*

_____

*(For Continuation of Caption See Reverse Side of Cover)*
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA (OKLAHOMA CITY)
THE HONORABLE VICKI MILES-LaGRANGE
D.C. NO. 5:12-CV-00465-M

## REPLY BRIEF FOR MOVANT-APPELLANT

SEAN CONNELLY
REILLY POZNER LLP
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
(303) 893-6100
sconnelly@rplaw.com

JOSEPH ALBERTO FONTI
JONATHAN M. PLASSE
JAVIER BLEICHMAR
SERENA P. HALLOWELL
JEFFREY R. ALEXANDER
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
(212) 907-0700
jfonti@labaton.com
jplasse@labaton.com
jbleichmar@labaton.com
shallowell@labaton.com
jalexander@labaton.com

*Attorneys for Movant-Appellant*

August 2, 2013

**ORAL ARGUMENT REQUESTED**

---

ONTARIO TEACHERS' PENSION PLAN BOARD,

*Movant-Appellant,*

– and –

IBI AMBAN INVESTMENT MANAGEMENT, LTD; CLAL PENSION & PROVIDENT FUND, LTD; ARKANSAS PUBLIC EMPLOYEES RETIREMENT SYSTEM; STATE UNIVERSITIES RETIREMENT SYSTEM OF ILLINOIS; STATE OF OREGON, by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board on behalf of the Oregon Public Employee Retirement Fund; SHI YAN,

*Movants.*

---

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

ARGUMENT ....................................................................................... 4

I.    THE COMPLAINT SUFFICIENTLY PLEADS SECURITIES
    FRAUD UNDER §10(b) ............................................................... 4

    A.    Defendants Had A Duty To Disclose The Known Truth ...................... 5

        1.    Defendants Had A Duty To Disclose Concealed Material
             Facts .................................................................................. 5

        2.    Defendants' Affirmative Disclosures Regarding FWPP
             And VPP Created A Duty To Disclose ...................................... 7

            (a)    Defendants' Misstatements Regarding
                McClendon's Alignment Of Interests Created A
                Duty To Disclose ..................................................... 7

            (b)    Defendants Made Statements About The VPPs
                While Concealing $1.4 Billion In VPP Liabilities ......... 11

        3.    SEC And GAAP Regulations Created A Separate Duty
             To Disclose The VPP Liabilities And The FWPP
             Conflicts ............................................................................ 13

            (a)    GAAP And Regulation S-K Created A  Duty To
                Disclose The FWPP Conflicts Of Interest ..................... 13

            (b)    Regulation S-K Item 303 Created A  Duty To
                Disclose The VPP Liabilities .................................... 15

    B.    The Complaint Sufficiently Alleges Scienter; The District Court
        Misapplied The Pleading Standard ...................................... 17

    C.    The Complaint Pleads A Strong Inference Of Scienter ..................... 19

1.      The "Obvious Materiality" Of The Statements And
        Omissions Supports A Strong Inference Of Scienter ...............19

2.      Defendants Violated Their Disclosure Obligations,
        Further Supporting A Strong Inference Of Scienter.................23

3.      Defendants' Knowledge Of Facts Contradicting Their
        Public Statements Supports A Strong Inference Of
        Scienter.......................................................................................24

4.      Defendants' Motive Further Supports A Strong Inference
        Of Scienter .................................................................................25

5.      Defendants' Remaining Arguments Are Also Meritless ..........27

        (a)      Absence Of A Restatement Is Irrelevant ........................27

        (b)      The Complaint Is Not A Puzzle Pleading.......................29

II.     CONCLUSION.................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*Adams v. Kinder-Morgan, Inc.*,
  340 F.3d 1083 (10th Cir. 2003) ......................................................11, 13, 20, 30

*Aldridge v. A.T. Cross*,
  284 F.3d 72 (1st Cir. 2002) ................................................................................28

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ..............................................................................................5

*Caiola v. Citibank*,
  295 F.3d 312 (2d Cir. 2002) ................................................................................7

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) .......................................................................10, 26

*City of Philadelphia v. Fleming Corp.*,
  264 F.3d 1245 (10th Cir. 2001) ...................................................................passim

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
  442 Fed. App'x 672 (3d Cir. 2011) ....................................................................25

*Constar Int'l Inc. Sec. Litig.*,
  585 F.3d 774 (3d Cir. 2009) .................................................................................6

*Croker v. Carrier Access Corp.*,
  2006 WL 2038011 (D. Colo. July 18, 2006) ......................................................24

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336 (2005) ..............................................................................................5

*In re Dynegy Sec. Litig.*,
  339 F. Supp. 2d 804 (S.D. Tex. 2004) ................................................................12

*In re Enron Sec. Litig.*,
  235 F. Supp. 2d 549 (S.D. Tex. 2002) ................................................................12

*FindWhat Investor Group v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) .............................................................7

*First New York Securities LLC v. United Rentals, Inc.*,
391 Fed. App'x 71 (2d Cir. 2010) ........................................................18

*Florida State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) ...............................................................26

*Ganino v. Citizens* Utilities Co.,
228 F.3d 154 (2d Cir. 2000) ................................................................10

*Guidance Endodontics v. Dentsply*,
2011 WL 1336473 (D.N.M. Mar. 31, 2011) ..........................................9

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) .................................................................7

*Jerman v. Carlisle*,
130 S. Ct. 1605 (2010)..........................................................................23

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) ................................................................23

*Kunz v. S.E.C.*,
64 Fed. App'x 659 (10th Cir. 2003) ......................................................6

*In re Level 3 Commc's, Inc. Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) ...........................................................29

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ...............................................................26

*Matrixx Initiatives, Inc. v. Siracusano*,
131 S. Ct. 1309 (2011)................................................................passim

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
455 Fed. App'x 10 (2d Cir. 2011) .......................................................26

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ..........................................................24, 25

*Pirraglia v. Novell*,
    339 F.3d 1182 (10th Cir. 2003) ........................................................13, 24, 27, 28

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
    645 F. Supp. 2d 210 (S.D.N.Y. 2009) .................................................................9

*S.E.C. v. Yuen*,
    272 Fed. App'x 615 (9th Cir. 2008) ..................................................................29

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ..................................................................................6

*Schwartz v. Celestial Seasonings, Inc.*,
    124 F.3d 1246 (10th Cir. 1997) ........................................................................29

*In re SemGroup Energy Partners, L.P.*,
    729 F. Supp. 2d 1276 (N.D. Okla. 2010) ..................................................5, 24, 25

*Slater v. A.G. Edwards & Sons, Inc.*,
    --F.3d--, 2013 WL 3390038 (10th Cir. July 9, 2013) ....................................3, 16

*Stern v. Leucadia Nat. Corp.*,
    844 F.2d 997 (2d Cir. 1988) .............................................................................10

*Sutton v. Utah State Sch. for the Deaf & Blind*,
    173 F.3d 1226 (10th Cir. 1999) ........................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .......................................................................17, 18, 25, 26

*U.S. v. Gordon*,
    710 F.3d 1124 (10th Cir. 2013) .............................................................7, 10, 13

*U.S. v. Miller*,
    658 F.2d 235 (4th Cir. 1981) ...........................................................................29

*In re Williams Sec. Litig.*,
    339 F. Supp. 2d 1242 (N.D. Okla. 2003) .....................................................29, 30

## STATUTES

15 U.S.C. § 78u-4(f)(10)(A) .....................................................................................18

**OTHER AUTHORITIES**

17 C.F.R. §229.303(a)..........................................................................................15, 16

17 C.F.R. §229.404(a)................................................................................................13

## INTRODUCTION AND SUMMARY OF ARGUMENT[1]

The District Court's misapplication of the long-established recklessness standard for pleading scienter was the sole basis for its dismissal of the Complaint. Plaintiff's opening brief demonstrated the manifest errors in that ruling.

Defendants, understandably not content to rely solely on the District Court's opinion, improperly dispute Plaintiff's well-pleaded factual allegations and also raise disparate arguments without basis in law. Defendants deny their duty to disclose the known facts, despite explicit statutory and GAAP-based disclosure requirements. Moreover, having spoken in half-truths, the law imposed on Defendants the duty to speak completely and honestly about the FWPP and VPP liabilities. Defendants incredibly submit McClendon was not motivated to maintain his $400 million FWPP interest, and that somehow Defendants' receipt of **free** Chesapeake shares that "dramatically increased" their stock holdings undercuts scienter.

---

[1] "AOB" or the "Opening Brief" refers to the Brief For Movant-Appellant, and "AAB" refers to the Brief of Defendants-Appellees. Capitalized terms not defined herein shall have the meaning defined in the AOB. "A-_" refers to Appellants' Appendix. "SA-_" refers to Appellees' Supplemental Appendix. All bold emphasis is added unless otherwise noted and internal citations and quotation marks are omitted. Underscore emphasis was original to the AAB.

Defendants' arguments run the risk of misleading, for example:

- Defendants argue that "McClendon was required to participate in <u>all</u> wells or none, successful or not" and was "required to pay <u>all</u> costs associated with the wells…." AAB 25-26. What this concedes is the essence of the allegation: McClendon only bore expenses for "spudded" wells—*i.e.*, wells that were drilled. He "shar[ed] in the boons and avoid[ed] the banes," motivating him to compel Chesapeake to acquire and explore land to maximize **his** odds of participating in wells. A-54,¶82. As a result, contradicting the Company's announced "fundamental shift" toward capital discipline, capital expenditures exceeded expectations by $2.5 billion, or 32%, AOB-21, at a time of historic gluts. AOB-10. *Infra* Section I.A.2(a).

- Defendants contend that they "disclosed" that "McClendon mortgaged his personal FWPP assets…." AAB 27-28. The article Defendants selectively quote in support, however, reveals the market's shock that McClendon mortgaged 100% of his interest through non-recourse loans from Chesapeake's lenders. A-154-56 (the "$1.1 billion is in a different ballpark" and "[t]he size of the loans is pretty shocking (equal to more than one-tenth of Chesapeake's total long-term debt), as is the clear and undeniable implication that McClendon is up to his eyeballs in conflicts…."). Tellingly, Defendants do not acknowledge that McClendon's non-recourse loans required him as CEO to "'take all commercially reasonable action' to ensure that Chesapeake 'comply with…[McClendon's loan] covenants and agreements.'" A-29,¶7. *Infra* Section I.A.2(a), 3(a).

- Defendants point to "voluminous VPP disclosures," AAB-33-34, n.33, but they cannot point to a single document that discloses the $1.4 billion in VPP liabilities. Indeed, Defendants themselves contradicted this argument. When the $1.4 billion in VPP liabilities were revealed in May 2012, A-60-61,¶¶106-07; A-63,¶113, Mobley defended the concealment of the liabilities, explaining that: "under accounting rules the company **cannot** disclose the operating-cost liability associated with the VPPs." A-161. In contrast, today, Chesapeake discloses this information. *Infra* Section I.A.2(b).

2

Defendants also take liberties with the law.  For example, they misquote a recent decision for the purported proposition that lack of a financial restatement "'conclusively defeat[s] any claim' of falsity." AAB-36 (partially quoting *Slater v. A.G. Edwards & Sons, Inc.*, --F.3d--, 2013 WL 3390038, at \*14 (10th Cir. July 9, 2013)).  *Slater* held no such thing.  *See infra* n.10.

What Defendants acknowledge is also telling.  As to the "relevant question whether a defendant was aware of the information that purportedly was 'concealed,'" Defendants answer: "Of course."  AAB-44.  Significantly, Defendants have never disputed Plaintiff's allegations of loss causation: that the stock drop and investors' losses were caused by the belated revelations of the truth about Defendants' misrepresentations.  How could they?  When the truth was finally revealed:

- Chesapeake's share price plummeted 60% from the Class Period high, A-31,¶15;

- S&P, Moody's and Fitch downgraded Chesapeake's credit rating two levels below "junk," A-57-58,¶¶93-94; A-59-60,¶¶103-105; A-65,¶119;

- $14 billion in anticipated asset sales were suspended for risk of breaching loan covenants, A-31,¶13;

- Chesapeake was required to amend its 2012 annual report and finally complied with requirements mandating disclosure of the concealed information in its public filings, SA-153;

- the SEC and IRS commenced investigations, which continue today, A-59,¶102; A-58,¶97; and

3

- ultimately, the FWPP was terminated, McClendon was removed as Chairman, and later forced from the Company he founded and led for 23 years.  A-37,¶35; A-64,¶116.

Given that the revelation of previously-concealed information was so demonstrably material to the market, Defendants' protestations ring hollow.  They cannot credibly deny making misstatements, concealing material information that they had a duty to disclose, or acting at least recklessly in doing so.

In short, Defendants cannot avoid the conclusion at the pleading stage that the Complaint adequately states a claim under §§10(b) and 20(a) of the Securities Exchange Act of 1934.  Defendants had knowledge of facts concerning the FWPP, McClendon's actions and conflicting interests, and the VPP liabilities that were so obviously material that Defendants must have been aware that non-disclosure would likely (and in fact did) mislead investors.  The District Court should be reversed, and Defendants should be directed to answer the Complaint.

## ARGUMENT

## I.    THE COMPLAINT SUFFICIENTLY PLEADS SECURITIES FRAUD UNDER §10(b)

The District Court erroneously dismissed the Complaint on the sole ground of scienter, not addressing Defendants' duty to disclose or the falsity of Defendants' statements.  Defendants, however, perhaps recognizing the limitations of the District Court's scienter analysis, ask the Court to affirm by holding that Defendants made no material misstatements and omissions.  AAB-24-36.

Defendants' alternative arguments are no more persuasive than their attempt to defend the District Court's actual reasoning.

### A.     Defendants Had A Duty To Disclose The Known Truth

Defendants admit they knew the concealed facts, AAB-44, and cannot seriously dispute those facts were material to investors.  Indeed, Defendants have never contested the "causal connection between the material misrepresentation[s] and the [economic] loss" investors suffered.  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Yet, Defendants contend they had no duty to disclose the truth.

"Under Section 10(b), a failure to disclose is actionable where a defendant is under a duty to disclose the information."  *In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1292 (N.D. Okla. 2010) (citing *Windon v. FDIC*, 805 F.2d 342, 347 (10th Cir. 1986)).  Defendants' duty to disclose arises from: (i) the materiality of the undisclosed information, (ii) Defendants' own affirmative statements, and (iii) specific regulations and accounting rules.

### 1.     Defendants Had A Duty To Disclose Concealed Material Facts

Materiality under §10(b) turns on whether the allegations create "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988);

*see also Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1323 (2011); AOB-27-29. While materiality alone does not necessitate disclosure, *Matrixx*, 131 S. Ct. at 1321, disclosure is required to make statements, "in the light of the circumstances under which they were made, not misleading." *Id.*

The "materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge." *Kunz v. S.E.C.*, 64 Fed. App'x 659, 665 (10th Cir. 2003). Defendants' omissions implicated (i) Chesapeake's core business strategy of debt reduction and asset monetization; and (ii) McClendon's conflicting actions and interest, which created undisclosed obligations for Chesapeake and put McClendon in conflict with shareholders.

Shareholders' and market participants' unequivocal reaction to the truth further demonstrates the importance of the omitted facts to the "total mix" of available information. For instance, credit rating agencies downgraded Chesapeake to two levels below investment grade (*i.e.*, below "junk" status), A-57-58, ¶¶93-94; A-59- 60, ¶¶103-105; A-65, ¶119; the SEC announced an investigation into Chesapeake's disclosures, A-59, ¶102; and the IRS announced an investigation into the CEO's incentive plan, A-58, ¶97; all of which led Chesapeake's stock price to fall 60% from the Class Period high, AOB-21-22. *See, e.g.*, *Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 783 (3d Cir. 2009); *In re*

*Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) ("The sharp criticism from industry analysts…indicates the weight given to information.").

### 2. Defendants' Affirmative Disclosures Regarding FWPP And VPP Created A Duty To Disclose

Even where no affirmative duty to speak exists, if a party "elects to disclose material facts, he must speak fully and truthfully, and provide complete and non-misleading information" on the subjects discussed.  *U.S. v. Gordon*, 710 F.3d 1124, 1142 (10th Cir. 2013).[2]  Here Defendants made affirmative statements giving rise to this duty.

### (a) Defendants' Misstatements Regarding McClendon's Alignment Of Interests Created A Duty To Disclose

On the first day of the Class Period, General Counsel Hood, in an attempt to allay shareholder concerns, wrote an open letter to *The Daily Oklahoman* stating that under the FWPP "the alignment of risk between Aubrey and the Company is unique and exemplary."  A-40,¶43.  **Hood further assured that McClendon's employment agreement required him to "refrain from outside activities that might be inconsistent with the best interests of the Company**."  *Id.*,¶44.  Hood's statements were reinforced by Class Period false statements that the FWPP:

---

[2] *See also, e.g.*, *Caiola v. Citibank*, 295 F.3d 312, 330-31 (2d Cir. 2002); *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001).

- "impos[ed] on the Founders the **same risks incurred by the Company in its core operations**," A-28,¶4; A-73-74,¶137;

- "align[s] **financial rewards and risks** of Mr. McClendon with the Company," A-28,¶4; A-39-41,¶¶42-45; A-73-74,¶137; and

- aligned McClendon's "**economic interests with the Company's long-term business plan**" to transition a land acquisition strategy to the asset monetization and debt reducing 25/25 Plan, A-39-41,¶¶43-45; A-73-74,¶¶136-39.

The above statements are objectively false. While Defendants now suggest that McClendon was responsible for all costs associated with acquiring the land and conducting exploration activities, AAB-26, only the most careful reading of Defendants' brief reveals that they concede the essence of the Complaint's allegations: McClendon only bore expenses for "spudded" wells—*i.e.*, wells that were drilled. AAB-25-26. As the Complaint alleged, McClendon did not bear any costs for land that was acquired and explored, **but that was not drilled**; he "shar[ed] in the boons and avoid[ed] the banes." A-54,¶82.

Rather than "impose on Mr. McClendon the same risks incurred by the Company," he had every incentive to compel Chesapeake to acquire and explore as much land as possible in hopes of finding drilling opportunities for his FWPP. As a result, Chesapeake's capital expenditures exceeded estimates by 32% at a time of historic gas supply gluts and low prices. Simply put, the FWPP did not align

McClendon's "economic interests with the Company's long-term business plan."
A-39-41,¶¶43-45; A-73-74,¶¶136-39.[3]

Defendants' arguments to the contrary are self-contradicting.  While they submit they were under no duty to disclose, AAB-31, they separately contend that their false statements conveyed the full truth, AAB-27-28, 32.  For instance, Defendants point to their statement that: (i) "FWPP does not restrict [McClendon's] sales, other dispositions or financing transactions involving FWPP interests"; and (ii)  that McClendon made "personal financing transactions…with respect to certain of his interests in the Company's wells."  AAB-28.  No reading of these statements conveys the facts:

- McClendon's non-recourse loan terms required him as CEO to "'take all commercially reasonable action' to ensure that Chesapeake 'comply with…[McClendon's loan] covenants and agreements,'" A-29,¶7; and

- during the Class Period, McClendon mortgaged 100% of his current and future interests in the FWPP borrowing $1.55 billion from Chesapeake's lenders, thereby competing directly with Chesapeake for desperately needed financing.  A-41,¶46.

---

[3] Defendants' alignment statements were not "subjective evaluations," *i.e.* puffery.  AAB-23.  Puffery is limited to "vague generalities that no reasonable person would rely on as assertions of particular facts."  *Guidance Endodontics v. Dentsply*, 2011 WL 1336473, at *7-8 (D.N.M. Mar. 31, 2011).  Whether McClendon's interests were aligned is a verifiable fact; they were not.  *See Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 220 (S.D.N.Y. 2009) (finding actionable defendants' statements that the company stock option plan was "'designed to align the executive's interests with that of the stockholders of the Company.'").

Defendants also misleadingly claim that "the Complaint itself recites the fact that 'investors <u>have known for years</u> that McClendon has borrowed against or sold portions of his [FWPP] stakes.'"  AAB-32.[4]  To the contrary, the article Defendants quote details that the revelation of these loans shocked the market. A-154-55 ("[The] **size of the loans is pretty shocking** (equal to more than one-tenth of Chesapeake's total long-term debt), **as is the clear and undeniable implication that McClendon is up to his eyeballs in conflicts**").[5]

Given Defendants' false and incomplete statements concerning McClendon's conflicts of interest and FWPP dealings, their omissions are actionable.  *Gordon*, 710 F.3d at 1142.

---

[4] Nowhere in the Complaint is this "fact" "recite[d]."  In any event, Plaintiff's allegations must be accepted as true at this stage.  *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).  Moreover, Defendants' contention is tantamount to a "truth-on-the-market defense," which should not be considered at this stage.  *See Ganino v. Citizens* Utilities Co., 228 F.3d 154, 167 (2d Cir. 2000).

[5] Defendants argue Plaintiff cannot cite media accounts as evidence of Chesapeake's and McClendon's perceived conflicts and undisclosed VPP obligations, citing *Stern v. Leucadia Nat. Corp.*, 844 F.2d 997, 1004 (2d Cir. 1988).  AAB-39.  *Stern* is inapposite: the plaintiff used media articles to **speculate** why the defendants might never have intended to complete a merger.  *Id.*  Here, Plaintiff used media reports to evidence, *inter alia*, the undisputed public reaction to the truth.  *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 662, n.10 (6th Cir. 2005) (taking judicial notice of articles supporting factual allegations).

**(b)   Defendants Made Statements About The VPPs
While Concealing $1.4 Billion In VPP Liabilities**

Defendants submit that they "disclosed a wealth of information" regarding

the VPPs, including the VPP date, the region, and the dollar proceeds received.

AAB-9; A-76-81,¶¶143-57.  Simultaneously, Defendants touted the benefits of the

VPPs to Chesapeake's strategic debt plan, for instance:

- Rowland stated that with respect to VPPs, "**there is no ongoing dollar
  obligation for us at all**."  AOB-12; A-48-49,¶67; A-78,¶145.

- Dell'Osso likewise stated that with VPPs Chesapeake "retain[ed] all the
  upside."  A-78,¶146.

- Chesapeake claimed that it maintained a "significant degree of control
  over the timing of our capital expenditures," allowing for flexibility in
  "defer[ing] or accelerat[ing] certain capital expenditures if accommodate
  liquidity needs.  A-69-70,¶131.

What Defendants improperly omitted is that, **far from having no "ongoing dollar**

**obligation," the VPPs carried $1.4 billion in off-balance sheet obligations**,

which for one quarter alone amounted to 23.7% of Company-wide production

expenses.  A-65,¶118.  This material omission is actionable.

When a company touts the financial benefits of a transaction, it has a duty to

disclose sufficient facts to allow shareholders to assess the true value of that

transaction.  *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1088-89, 1096-97

(10th Cir. 2003) (finding a duty to disclose where plaintiffs emphasized the

profitability of a given plant without disclosing the corresponding liability).  This

11

rule applies specifically to off-balance sheet transactions.  For example, in *In re Dynegy Sec. Litig.*, 339 F. Supp. 2d 804, 891 (S.D. Tex. 2004), the court concluded Dynegy's disclosures of off-balance sheet transactions concealed the "repayment obligation, ratings triggers and other key terms," *i.e*., the true liabilities at stake. *Id*.  Similarly, the court in *In re Enron Sec. Litig.*, 235 F. Supp. 2d 549, 616-17, 693 (S.D. Tex. 2002), concluded the defendants improperly excluded a related entity's obligations from its financial reports (while reporting the revenues), rendering the statements misleading.

Defendants also contend the VPP liabilities "were included in the Company's financial statements," citing several specific pages of disclosures. AAB-34, n.33.  This assertion is demonstrably false, and is contradicted by Defendants' prior statements:

- When *The Wall Street Journal* first revealed Chesapeake "has saddled itself with about $1.4 billion of previously unreported [VPP] liabilities," Mobley responded that "under accounting rules the company **cannot disclose** the operating-cost liability associated with the VPPs," A-60,¶106; A-160-61;

- The various disclosures Defendants point the Court to **do not** disclose VPP-specific liabilities.  *See, e.g.*, SA-209.  Instead they show Company-wide production costs on a "million cubic feet equivalent" basis.  *Id.*  It is impossible for any reader of the financial statements to accurately discern how much of that cost is attributed to VPPs; and

- Not until July 2012 did Chesapeake reveal that VPPs accounted for 23.7% of Company-wide production expenses for one quarter alone. A-65,¶118.  Starting in August 2012, Chesapeake's Forms 10Q began disclosing VPP-specific production expenses.

In short, despite Defendants' unsupported assertions, they did not disclose

the VPP liabilities during the Class Period.  Given Defendants' false and

incomplete statements concerning these VPPs, Defendants' omissions are

actionable.  *Gordon*, 710 F.3d at 1142; *Adams*, 340 F.3d at 1088-89, 1096-97.

### 3.    SEC And GAAP Regulations Created A Separate Duty To Disclose The VPP Liabilities And The FWPP Conflicts

The Complaint's well-pled allegations specifically detail the SEC

regulations and GAAP provisions that required Defendants to disclose the truth.

While Defendants may contest the application of these rules at trial, at the pleading

stage, the Court must accept these allegations as true.  *See Pirraglia v. Novell*, 339

F.3d 1182, 1193-94 (10th Cir. 2003).

### (a)    GAAP And Regulation S-K Created A Duty To Disclose The FWPP Conflicts Of Interest

Although Defendants try to complicate the issue, Plaintiff's allegation is

simple: the FWPP, as Defendants' SEC filings recognize, is a related-party

transaction under GAAP and Regulation S-K.  A-71-74,¶¶133-38.[6]  Pursuant to

these regulations and accounting rules, *see* A-41-45,¶¶47-57, Defendants were

obligated to disclose information related to the FWPP that was "material to

---

[6] Defendants quote Reg. S-K Item 404(a) as applying only to transactions "in which any related person had or will have a direct material interest." AAB-28-29. This quote misstates 404(a)'s explicit application to "direct **or indirect** material interest," 17 C.F.R. §229.404(a), the true scope of Defendants' duty.

investors in light of the circumstances of the particular transaction," A-43,¶52, and

"**that would make a difference in decision making**."  A-42,¶¶49-50.[7]  Plaintiff

alleges that this information includes:

- that McClendon financed his entire FWPP interest during the Class Period through $1.55 billion of non-recourse loans from Chesapeake's lenders—competing directly with Chesapeake for necessary financing, A-44,¶54; A-57,¶92;

- the terms of McClendon's financing required him to participate in the FWPP each subsequent year and pledged future well interests (*i.e.,* Chesapeake's assets) in violation of the FWPP terms, AOB-17-18; A-53,¶81;

- McClendon's loan covenants required him to have Chesapeake operate in the best interest of his lenders, not shareholders, A-52-53,¶¶79-80; and

- McClendon's FWPP terms exempted him from acquisition and exploration costs for land deemed unworthy of drilling.  Thus, he was incentivized to, and did, continue Chesapeake's "land grab" strategy, A-28,¶6; A-46-¶59; A-53-54,¶¶81-82.

Tellingly, following the revelations of the truth, Chesapeake supplemented

its disclosures under the heading "Certain Relationships and Related

Transactions."  *See*, *e.g.*, SA-158.  These disclosures finally provided material

information concerning McClendon's loans that was improperly omitted during the

---

[7] Regulation S-K also required Chesapeake to "explain **all material elements** of the registrant's compensation of the named executive officer," including the "objectives" and "how each compensation element…fit[s] into [the] overall compensation objectives."  A-45,¶57; A-178; Item 402(b)(1).  The $1.55 billion in loans was material to the public's understanding of McClendon's compensation and his FWPP interest, as evidenced by the market's reaction upon their disclosure. A-52-56,¶¶79-85, 88.

Class Period, including that he mortgaged his FWPP interests with Chesapeake

lenders and that these mortgages are used to "secure loans used **in whole** or in part

to fund Mr. McClendon's well costs."  A-64-65,¶¶115-17.  Defendants'

contentions—that they previously disclosed this information or that they did not

have a duty to disclose this information—are belied by these changed disclosures.

**(b)    Regulation S-K Item 303 Created A
Duty To Disclose The VPP Liabilities**

Regulation S-K Item 303(a) required disclosure of Chesapeake's VPP

obligations, as expenses related to "off-balance sheet arrangements."  AOB-37-38;

A-51,¶75.[8]  In response, Defendants disingenuously cite Plaintiff's Opposition to

Defendants' Motion to Dismiss, A-186, for the proposition that VPPs "do not

constitute debt and thus do not create debt or liability **to place on the balance

sheet**."  AAB-11.

That is not a concession; that is the point.  The VPPs were **off**-balance sheet

liabilities, and Defendants' fraud resulted from concealing those liabilities in

violation of GAAP and Item 303.  AOB-37-38; A-51,¶75.  As alleged, the VPPs

were financing transactions whereby Chesapeake received upfront cash, and paid

back the obligation with natural gas production.  A-48,¶67.  Chesapeake was

---

[8] Item 303(a) also required disclosure in the MD&A section of Chesapeake's
annual reports of "information that the registrant believes to be necessary to an
understanding of its financial condition, changes in financial condition and results
of operations."  17 C.F.R. §229.303(a); A-51,¶75.

contractually obligated to bear the associated production costs; it could not control the timing of capital expenditures. AAB-44; AOB-11. That economic reality was subject to disclosure, regardless of whether it was labeled a debt, liability, obligation, or "on" or "off" balance sheet.

Defendants' contention that they met their disclosure obligations is belied by Chesapeake's disclosure changes. Defendants now include an extended discussion of VPPs under a newly created section entitled "Contractual Obligations and Off-Balance Sheet Arrangements," which provides information as to specific VPP expenses.[9] Defendants were required to disclose the truth.[10]

---

[9] The Court may take judicial notice of publicly filed facts referenced in this brief. *See* AOB-8, n.3. Chesapeake's publicly filed November 2, 2012 10-Q includes for the first time the section "Contractual Obligations and Off-Balance Sheet Arrangements."
http://www.sec.gov/Archives/edgar/data/895126/000089512612000310/chk-2012930x10q.htm.

[10] Defendants misleadingly quote a recent Tenth Circuit opinion as holding that an auditor's approval of financial statements and the company's decision not to restate financial statements "'conclusively defeat[s] any claim' of falsity." AAB-36 (quoting *Slater*, 2013 WL 3390038, at *14). *Slater* held no such thing; its narrow holding is inapposite. There, the plaintiffs' claim was based on an outside auditor's letter ("the March 4 KPMG letter"). *Id.* at *13-14. All *Slater* held is that the auditor's later statements and approval of the company's financials "conclusively defeat any claim **that relies solely on the March 4 KPMG letter**." *Id*. at *14.

16

### B.   The Complaint Sufficiently Alleges Scienter; The District Court Misapplied The Pleading Standard

The Complaint satisfies the Court's well-settled recklessness standard for pleading scienter—*i.e.*, whether Defendants had "knowledge of a fact that was so obviously material that the defendant[s] must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *City of Philadelphia v. Fleming Corp.*, 264 F.3d 1245, 1261 (10th Cir. 2001). The Supreme Court recently reaffirmed this standard in *Matrixx*. 131 S.Ct. 1309.

Defendants concede that the "relevant question [is] whether a defendant was aware of the information that purportedly was 'concealed.'" AAB-44. They acknowledge: "Of course McClendon knew about his FWPP loans—they are his <u>personal</u> loans. Likewise, Chesapeake knew that it bears the production costs associated with its VPPs—they are the Company's <u>own</u> contracts." *Id.*

Thus, the remaining question is whether the undisclosed truth was "so obviously material that [Defendants] must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *Fleming*, 264 F.3d at 1261; AOB-27-35.

Without articulating—let alone contending with—the controlling recklessness standard, Defendants insist the District Court's analysis conformed to the law. AAB-38,45-50. Despite *Tellabs*, *Matrixx* and *Fleming*, the District Court improperly applied a "bright-line," "smoking-gun" style actual knowledge

standard. *Matrixx*, 131 S. Ct. at 1313; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) ("The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences…"); *Fleming*, 264 F.3d at 1261.

Ignoring controlling law, Defendants suggest that, even though they knew the omitted information, and it was so obviously material that non-disclosure would mislead investors, Plaintiff would still need to plead "facts supporting a strong inference of an intent to deceive, manipulate or defraud..."[11] AAB-47. This is simply not the law under the PSLRA, this Circuit, or any other court.[12]

Lifting nearly *verbatim* Defendants' arguments, A-126, the District Court required evidence of "any meeting attended by any defendant, any internal report he received or reviewed, any internal email, or any other information," showing

---

[11] Defendants' citation to *First New York Securities LLC v. United Rentals, Inc.*, 391 Fed. App'x 71 (2d Cir. 2010), is unavailing. There, the court concluded the defendants objectively believed their purported false statement that a merger "would close as originally negotiated." *Id*. at 73. This ruling is wholly consistent with the *Fleming* standard.

[12] The standard Defendants advance would place the pleading burden for scienter higher than the PSLRA's standard for proving a "knowing" violation to apportion fault at trial. *See* 15 U.S.C. §78u-4(f)(10)(A). The PSLRA does not require proof at trial, let alone at pleading, of defendant's intent to deceive or knowledge that investors would rely on the misstatement.

18

that the defendants **knew** that non-disclosure **would** mislead investors (*i.e.,* evidence of actual intent to deceive).  A-354-55.[13]

The District Court erred in seeking specific types of evidence.  Scienter is a "fact-specific inquiry, which is bound, not by labels or magic words but by the totality of the facts presented in the complaint…[In passing the PSLRA],…Congress was concerned with the quantum, not type of proof." *Fleming*, 264 F.3d at 1263.  This case involves unique facts, which will not fit any scienter rubric or checklist.  The well-pled allegations together with Defendants' knowledge of the concealed facts, satisfy the required quantum of proof.

### C.    The Complaint Pleads A Strong Inference Of Scienter

####     1.    The "Obvious Materiality" Of The Statements And Omissions Supports A Strong Inference Of Scienter

As established in the Opening Brief, the "obvious material[ity]" of a concealed fact depends on the context.  The relevant analysis here is whether the

---

[13]  Obfuscating the error below, Defendants purport to quote the District Court's opinion to include recklessness, when in fact the District Court applied an actual knowledge standard.  The below quote illustrates the discrepancy (Defendants removed the stricken-out text and disingenuously inserted the **bold** text):

> the Complaint is devoid of any particularized factual allegations that would give rise to a strong inference that any defendant acted with ~~the requisite scienter~~ **an intent to deceive, manipulate or defraud, or recklessness**

*See* AAB-38 (citing A-354).

concealed information Defendants admit knowing was "so significant that Defendants were reckless in not disclosing" it. AOB-29-35; *Fleming*, 264 F.3d at 1265-66. This is an objective standard. *See Adams*, 340 F.3d at 1105 (holding "a 'strong inference' of scienter [is] a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading.").

In response to shareholders' concerns arising from McClendon's margin calls and resulting 40% stock drop, AOB-9, Defendants sought to assure investors that the FWPP "fully aligns the interests of Mr. McClendon with the Company." A-73-74,¶¶136-39. Rather than align his interests, at a time the Company was undertaking a purported "fundamental shift" toward capital discipline, McClendon was driven to maximize the Company's acquisition and exploration costs to improve the odds of yielding wells for his FWPP. In turn, unbeknown to shareholders, McClendon then financed 100% of the cost of his Class Period participation in the FWPP with non-recourse loans from the Company's lenders, competing with the Company for much needed financing. AOB-16; A-38-39,¶¶38-41; A-28,¶4; A-39-40,¶43; A-73,¶136; A-70-74,¶¶132-37; A-83-86,¶¶160-69.

Similarly, Defendants emphasized the VPPs as part of their "25/25 Plan" to improve Chesapeake's debt ratings and liquidity, A-47-48,¶64; A-67,¶125, and

identified the VPPs as "dramatically improv[ing]" Chesapeake's financial condition, facilitating Chesapeake's debt-reduction goals and providing a "great monetization…where [Chesapeake] retain[ed] all the upside." AOB-29-30; A-67-69,¶¶126,129; A-77-82,¶¶143-59. Yet, VPP liabilities amounted to more than 10% of Chesapeake's outstanding liabilities, the timing of which Defendants could not control. AOB-13; AOB-29-30; A-60-62,¶¶106-11; A-52,¶77; A-65,¶118.

These well-pled facts meet, if not exceed, the *Fleming* standard. In *Fleming*, the Court concluded an allegedly undisclosed litigation risk was not obviously material where the value of an adverse judgment was difficult to quantify (estimated at 2.4-3.5% of company assets). *Fleming*, 264 F.3d at 1264-68.[14]

Here, the concealed information does not relate merely to **potential** risks. The VPP liabilities are contractually obligated, amounting to over 23% of Company-wide production expenses for one quarter alone. A-65,¶118. McClendon's conflicts of interest were **certain** and resulted in capital expenditures of $2.48 billion, or 32%, above expectations. A-59,¶98. The impact of these revelations was also concrete. For instance, revelation of McClendon's dealings

---

[14] Furthermore, the *Fleming* defendants never spoke about the relevant litigation, and the governing disclosure requirement only called for disclosure of risks in excess of 10% of assets. Thus the defendants had no apparent duty to disclose the litigation. *Cf. supra* at A.2.

resulted in (i) credit downgrades, (ii) SEC and IRS investigations, (iii) termination of the FWPP, (iv) Hood's removal as General Counsel, and (v) McClendon's removal from the Board, and ultimately the Company.  A-58-60,¶¶97, 103-04; A-64-65,¶¶116, 119.

Moreover, the sheer size of McClendon's loans evidences the significance of Defendants' admittedly material omissions.  McClendon's loans equaled more than 10% of Chesapeake's total long-term debt.  A-54,¶83.  *Cf. Fleming*, 264 F.3d at 1264-68.  It is against this factual backdrop that the recklessness of Defendants' conduct is assessed.  *See id*. 264 F.3d at 1265-66; *Matrixx*, 131 S. Ct. at 1324-25.[15]

Defendants' attempt to distinguish *Matrixx* on its facts also fails. AAB-49-50.  Defendants ignore that *Matrixx*, like *Fleming*, articulates an objective evaluation of the alleged omissions **in context**.  In *Matrixx*, the Supreme Court held the "allegations, 'taken collectively,' g[a]ve rise to a 'cogent and compelling' inference that Matrixx elected not to disclose [the known concealed information] not because…[it was] meaningless but because it understood [its] likely effect on the market."  *Id.* at 1324-25.  The same strong inference is pled here.  AOB-27-29.

---

[15] As discussed above and in the Opening Brief, the FWPP and the VPPs were components of Chesapeake's "core operations," further supporting the strong inference that the truth about these transactions was "so significant that Defendants were reckless in not disclosing" it.  A-47-48,¶64; A-66-70,¶122-23; A-28,¶4, A-39,¶42.  Although, Defendants question whether the core operations doctrine survived the PSLRA, numerous Courts of Appeal have concluded that it does. AOB-35-36 (citing to the Seventh, Ninth, Third, and Second Circuits).

Moreover, Defendants do not articulate any plausible competing inference. At most, they suggest that despite knowing the concealed information and understanding it was material, they did not believe they had a duty to disclose. However, ignorance of the law is no defense, and cannot outweigh a plausible strong inference of scienter.[16]  In this context, the inference that Defendants understood the truth's likely effect on the market is as plausible, if not more plausible, than the competing inference, if any.

> ### 2.    Defendants Violated Their Disclosure Obligations, Further Supporting A Strong Inference Of Scienter

Despite Defendants' denials, addressed in detail above, Regulation S-K, GAAP, and SOX required Defendants to disclose McClendon's FWPP loans and the related conflicts of interest and the VPP liabilities.  *See supra* Section I.A.3 (addressing Defendants' duty to disclose).  In view of Defendants' conceded knowledge and the materiality of that information, Defendants' breach of their duties under these rules is actionable.  AOB-37-38.  *See Kalnit v. Eichler*, 264 F.3d

---

[16] To prove a "knowing" violation of the PSLRA, **a plaintiff is not required to prove that a defendant knew of its duty to disclose**.  *Cf. Jerman v. Carlisle*, 130 S. Ct. 1605, 1611 (2010) ("We have long recognized the 'common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.'  ...Our law is therefore no stranger to the possibility that an act may be 'intentional' for purposes of civil liability, even if the actor lacked actual knowledge that her conduct violated the law.").

131, 143 (2d Cir. 2001); *Pirraglia*, 339 F.3d at 1192 (concluding GAAP violations may support an inference of scienter).[17]

Once Plaintiff has alleged the plausibility of such violations, they must be accepted as true. *See Pirraglia*, 339 F.3d at 1194. Defendants' attempt to debate the application of GAAP and SEC regulations is not appropriate at this stage.

Here, Defendants' disregard for their SOX obligations is especially egregious. SOX was enacted following the Enron collapse specifically to require disclosure of off-balance sheet liabilities such as VPPs. A-50,¶73. SOX further required McClendon, Rowland, and Dell'Osso to publicly file sworn certifications attesting that Chesapeake's financial statements were accurate. They did so while knowing that the VPP expenses remained concealed. A-86-88,¶¶170-75. *See Croker v. Carrier Access Corp*., 2006 WL 2038011 at *11 (D. Colo. July 18, 2006); *SemGroup*, 729 F. Supp. 2d at 1298.

### 3.     Defendants' Knowledge Of Facts Contradicting Their Public Statements Supports A Strong Inference Of Scienter

"[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak v. Kasaks*, 216

---

[17] Defendants were further aware of their obligations under Regulation S-K, due to a May 30, 2008 SEC Comment Letter raising concerns about Chesapeake's VPP disclosures. Yet Defendants failed to disclose VPP liabilities during the Class Period. AOB-38.

F.3d 300, 308 (2d Cir. 2000);[18] *see also SemGroup*, 729 F. Supp. 2d at 1298.

Defendants' omission of **known** facts contradicting their public statements about

the FWPP and VPPs further supports an inference of scienter.  *See also*

*supra* Section I.A.1.

### 4.     Defendants' Motive Further Supports A Strong Inference Of Scienter

Defendants' assertion that McClendon did not have a concrete personal

interest in preserving his FWPP interests, or in concealing his secret loans (for fear

of jeopardizing his participation in the FWPP), defies economic logic and ignores

human nature.  AOB-43-44; A-192.  It is also contradicted by Defendants' own

argument that the FWPP is "valued at over $400 million[,]…[] comprised

substantially all of McClendon's personal financial interest in the

Company,…[and] certainly counts as having 'skin in the game.'"  AAB-26-27.[19]

SA-159; *see Tellabs*, 551 U.S. at 325 ("personal financial gain may weigh heavily

in favor of a scienter inference").

McClendon also had an interest in preserving his position as Chairman of

the Board and CEO—neither of which he holds now.  A-192.  *See City of Roseville*

*Employees' Ret. Sys. v. Horizon Lines, Inc.*, 442 Fed. App'x 672, 679 (3d Cir.

---

[18] *See Fleming*, 264 F.3d at 1265 (approving the *Novak* recklessness standard).

[19] Defendants argue that McClendon's FWPP interests were not cash flow positive, but Chesapeake's SEC filings are to the contrary.  A-184, n.7.

2011) (CFO's untimely resignation in close proximity to revelation of accounting violations supported inference of scienter).  Upon the revelation of McClendon's conflicting interests and personal loans, he was removed from the Board and the FWPP was prematurely terminated.  AOB-20, 43-44.

Defendants argue that the Company did not "terminate" the FWPP before its expiration.  Instead they insist that "[t]he Board and [McClendon] voluntarily renegotiated the terms of the FWPP to provide for **early termination** on June 30, 2014…."  AAB-6, n.5.  To suggest McClendon "voluntarily" gave up his lucrative incentive is simply incredible.  *See Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 663 (8th Cir. 2001) (financial incentives other than stock sales support an inference of scienter).

Defendants also contend that the absence of "suspicious sales of Chesapeake stock during the alleged Class Period **devastates** any inference of fraud."  AAB-50-51.  Defendants' position is belied by clear legal precedent, including *Tellabs* and *Matrixx*, which find scienter in the absence of suspicious insider sales.[20]  *See Tellabs*, 551 U.S. 308; *Matrixx*, 131 S. Ct. 1309.  The absence of

---

[20] *See, e.g.*, *Lormand v. US Unwired, Inc*., 565 F.3d 228, 255 (5th Cir. 2009); *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 685 (6th Cir. 2005); *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. App'x 10 (2d Cir. 2011).

insider trading is simply not dispositive of the scienter analysis. *Pirraglia*, 339

F.3d at 1191, n.12 (refusing to dismiss for lack of insider sales).

Moreover, Defendants' argument is misleading. AAB-51-53. Despite

claiming that they "dramatically increased their stock holdings," Defendants

received almost all of their Class Period shares in the form of **free** compensation

awards or Chesapeake stock options. A-197; A-214-292 (McClendon received

more than 1.8 million free shares and purchased only 44,600 shares; Dell'Osso

received 305,577 free shares and purchased only 9,000 shares; Johnson received

299,315 free shares and purchased no shares; Hood received 340,849 free or

discounted shares and purchased no shares on the open market). Defendants even

disposed of a large number of shares during the Class Period to pay the tax liability

associated with their awards and the exercise of options. A-197. Such increased

holdings do not raise any inference of trust or confidence in Chesapeake's future.[21]

### 5.    Defendants' Remaining Arguments Are Also Meritless

### (a)    Absence Of A Restatement Is Irrelevant

Defendants insist that the absence of a restatement and Chesapeake's

unqualified audit opinions undermine a strong inference of scienter. AAB-40-42.

---

[21] Hood sold call options on March 30, 2011 on 75,000 shares (nearly 13% of his holdings) with a $40 strike price, *i.e.*, **betting against** the Company. A-197, n.16. McClendon's purchase of 44,000 shares on the open market is of no moment. That purchase represented only 2% of the two million shares he held at the beginning of the Class Period. A-198, n.18; A-215.

They are wrong. First, here, allegations of fraud do not rest on financial reporting violations; this is a case of disclosure fraud.[22] Second, "the fact that the financial statements…were not restated does not end [plaintiff's] case….To hold otherwise would shift to accountants the responsibility that belongs to the courts," and allow defendants "to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement…" *Aldridge v. A.T. Cross*, 284 F.3d 72, 83 (1st Cir. 2002). In *Pirraglia*, the Court dispatched with this strawman, and sustained the complaint even though "th[e] purported gigantic fraud… apparently escaped the attention of Novell's independent auditor…not to mention the SEC…." 339 F.3d at 1193-1194 ("[W]e decline defendants' invitation to conclude that the facts alleged by the plaintiffs are false, because nothing in the Reform Act allows us to do so.").

---

[22] An unqualified audit opinion on MD&A disclosures is not meaningful because auditors have only a limited duty to review information and disclosures outside the audited financial statements. *See* SAS 118,¶5. Under Regulation S-K, full disclosure in the MD&A is management's responsibility, not the auditor's: "The MD&A requirements are intended to…**enable[] investors to see the company through the eyes of management**…." Financial Reporting Release 72, Dec. 29, 2003. Further, many of the disclosures at issue here were contained in proxy statements, for which auditors provide no assurances. *See* SAS 37, "*Filings Under Federal Securities Statutes*."

At this stage, the only question before the Court is whether Plaintiff satisfies the pleading requirements and whether the facts as pled give rise to a strong inference of scienter.[23]

### (b)     The Complaint Is Not A Puzzle Pleading

Defendants rehash from below the assertion that the Complaint is a "puzzle pleading."  AAB-20-22.  Notably, the District Court did not even acknowledge their argument.  The Complaint identifies the "time, place, and contents of the alleged fraudulent statements"; "identifies the documents, press releases, and other communications which contain the statements"; and "specifically alleges the facts which the statements misrepresented or failed to disclose." *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997).  That is enough.[24]  Ironically, despite their arguments, Defendants appear to have no trouble identifying the claims and responding to the allegations.[25]

---

[23] Defendants' attempt to assert a "reliance on the auditor" defense is likewise premature.  Reliance on the auditor is a fact-intensive inquiry requiring Defendants to establish both "full disclosure of all pertinent facts" to the auditor and "good faith reliance" on the auditor's advice.  *U.S. v. Miller*, 658 F.2d 235, 237 (4th Cir. 1981); *see S.E.C. v. Yuen*, 272 Fed. App'x 615, 617 (9th Cir. 2008).

[24] *See In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1261 (N.D. Okla. 2003).  The lone Tenth Circuit case Defendants cite in this regard rejected the lower court's dismissal on such grounds.  *See In re Level 3 Commc's, Inc. Sec. Litig.*, 667 F.3d 1331, 1339, n.8, 1343 (10th Cir. 2012).

[25] Defendants argue that Plaintiff tries to "impute[]" scienter merely on the basis of Defendants' position.  AAB-15.  The Complaint, however, details the

## II.    CONCLUSION

The Complaint satisfies the pleading standard under §10(b), the PSLRA, and

the Court's precedents.[26]  For all the reasons stated herein and in the Opening

Brief, Plaintiff respectfully submits the Court should reverse the District Court's

Order, and direct Defendants to answer the Complaint.

Dated: New York, New York
       August 2, 2013

**LABATON SUCHAROW LLP**

By: /s/ Joseph A. Fonti
Joseph A. Fonti
Jonathan M. Plasse
Javier Bleichmar
Serena Hallowell
Jeffrey R. Alexander
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
212-907-0700 (tel)
212-818-0477 (fax)

Sean Connelly
REILLY POZNER LLP
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
303-893-6100 (tel)
303-893-6110 (fax)
*Attorneys for Movant-Appellant*

---

misstatements and omissions attributable to each Defendant.  A-65-90,¶¶120-78.
*See Williams*, 339 F. Supp. 2d at 1261 (sufficient where plaintiff "provides notice
to each Defendant regarding the statements and omissions that plaintiffs allege are
misleading and the reasons why…").

[26] Because Plaintiff's §10(b) claims are viable, Plaintiff's §20(a) claims should
also survive.  *See Adams*, 340 F.3d at 1107-08.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

I hereby certify pursuant to Fed. R. App. P. 32(a)(7)(C) that the attached brief is proportionally spaced, has a typeface (New Times Roman) of 14 points, and contains 6,835 words (excluding, as permitted by Fed. R. App. P. 32(a)(7)(B), the corporate disclosure statement, table of contents, table of authorities, and certificate of compliance), as counted by the Microsoft Word program used to produce this brief.

Dated:  New York, New York
        August 2, 2013

**LABATON SUCHAROW LLP**

By: /s/ Joseph A. Fonti
Joseph A. Fonti
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
212-907-0700 (tel)
212-818-0477 (fax)

# CERTIFICATION OF DIGITAL SUBMISSION

CASE NAME: Weinstein v. McClendon

DOCKET NUMBER:  13-6121

I, Robin M. Zuckerman, hereby certify that with respect to the following:

(1) all required privacy redactions have been made per 10th Cir. R. 25.2;

(2) I have compared the text of the PDF version of the attached document with the paper version and have found them to be identical;

(3) the digital submissions have been scanned for viruses using Micro Trend Office Scan 6.0,  and according to the program are free of viruses.

/s/ Robin M. Zuckerman
Robin M. Zuckerman
Appealtech

Dated:  August 2, 1013

| | | | | |
|---|---|---|---|---|
| **STATE OF NEW YORK** | ) | | **Filed** | |
| | | SS. | ☐ **Mail** | |
| **COUNTY OF NEW YORK** | ) | | ☐ **Hand** | |
| | | | ☐ **FedEx** | |

Robin M. Zuckerman, being duly sworn, deposes and says that deponent is not a party to the action, is over 18 years of age, and resides at the address shown above, or at 475 Bull Mill Road, Chester, N.Y. 10918.

That on the 2nd day of August, 2013, deponent served the within

**REPLY BRIEF FOR MOVANT-APPELLANT**

upon the attorneys, and by the method designated below, who represent the indicated parties in this action, and at the addresses below stated, which are those that have been designated by said attorneys for that purpose.

☐   Via the CM/ECF Case filing System. All counsel of record in this case are registered CM/ECF users. Filing and Service were performed by direction of counsel.

I certify on August 2, 2013, I electronically filed the foregoing Brief with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses. Seven Paper copies of the Brief have been sent to the court via Federal Express Overnight Delivery.

| | |
|---|---|
| MICHAEL T. SCOTT | SPENCER F. SMITH |
| ALEXANDER TALARIDES | MCAFEE & TAFT |
| ROBERT P. VARIAN | 211 North Robinson Avenue, 10th Floor |
| ORRICK, HERRINGTON & STUCLIFFE | Oklahoma City, Oklahoma 73102 |
| *Attorneys for Defendants-Appellees* | (405) 235-9621 |
| 405 Howard Street | spencer.smith@mcafeetaft.com |
| San Francisco, California 94105 | |
| (415) 773-5700 | |
| tscott@orrick.com | |
| atalarides@orrick.com | |

Sworn to before me this
2nd day of August, 2013.                                          s/ Robin M. Zuckerman
s/ Sonjia Richards
Sonjia Richards
Notary Public, State of New York
No. 03-4998375
Qualified in Bronx County
Commission Expires June 29, 2014

**ORIGINAL**

22585